**HARRODS LIMITED, Plaintiff–Appellant,**

v.

**SIXTY INTERNET DOMAIN NAMES;** Harrodsargentina.Com; Harrodsargentina.Net; Harrodsargentina.Org; Harrodsbuenosaires.Com; Harrodsbuenosaires.Net; Harrodsbuenosaires.Org, Defendants–Appellees.

**Harrods Limited, Plaintiff–Appellee,**

v.

**Fifty–Four Internet Names;** Harrodssudamerica.Com; Harrodssudamerica.Net; Harrodssudamerica.Org; Harrodssouthamerica.Com; Harrodsouthamerica.Net; Harrodssouthamerica .Org; Harrodsbrasil.Com; Harrodsbrasil.Net; Harrodsbrasil.Org; Harrodsbrazil.Com; Harrodsbrazil.Net; Harrodsbrazil.Org; Ciberharrods.Com; Ciberharrods.Net; Ciberharrods.Org; Cyberharrods.Com; Cyberharrods.Net; Cyberharrods.Org; Harrodsbank.Com; Harrodsbank.Net; Harrodsbank.Org; Harrodsbanking.Com; Harrodsbanking.Net; Harrodsbanking.Org; Harrodsfinancial.Com; Harrodsfinancial.Net; Harrodsfinancial.Org; Harrodsservices.Com; Harrodsservices.Net; Harrodsservices.Org; Harrodsvirtual.Com; Harrodsvirtual.Net; Harrodsvirtual.Org; Harrodsstore.Com; Harrodsstore.Net; Harrodsstore.Org; Tiendaharrods.Com; Tiendaharrods.Net; Tiendaharrods.Org; Harrodsamerica.Com; Harrodsamerica.Net; Harrodsamerica.Org; Shoppingharrods.Com; Shoppingharrods.Net; Shoppingharrods.Org; Harrodsshopping.Com; Harrodsshopping.Net; Harrodsshopping.Org; Harrodsbashopping.Com; 2 Harrodsbashopping.Net; Harrods-

bashopping.Org; Harrodsshopping-ba.Com; Harrodsshoppingba.Net; Harrodsshoppingba.Org, Defendants–Appellants.

Nos. 00–2414, 01–1928.

United States Court of Appeals, Fourth Circuit.

Argued April 3, 2002.

Decided Aug. 23, 2002.

**ARGUED:** Ralph Arthur Taylor, Jr., Dorsey & Whitney, L.L.P., Washington, D.C., for Plaintiffs–Appellants. Susan J. Kohlmann, Pillsbury Winthrop, L.L.P., New York, New York, for Defendants–Appellees. **ON BRIEF:** Kevin B. Bedell, Dorsey & Whitney, L.L.P., Washington, D.C.; Bruce R. Ewing, Lile H. Deinard, Dorsey & Whitney, L.L.P., New York, New York, for Plaintiffs–Appellants. Rodney H. Glover, Attison L. Barnes, III, Charles C. Lemley, Gardner, Carton & Douglas, Washington, D.C., for Defendants–Appellees.

Before WILKINS and MICHAEL, Circuit Judges, and HAMILTON, Senior Circuit Judge.

Affirmed in part, reversed in part, and remanded by published opinion. Judge MICHAEL wrote the opinion, in which Judge WILKINS and Senior Judge HAMILTON joined.

## OPINION

MICHAEL, Circuit Judge.

This case involves a dispute over Internet domain names between two companies named "Harrods," both with legitimate rights to the "Harrods" name in different parts of the world. The plaintiff, Harrods Limited ("Harrods UK"), is the owner of the well-known Harrods of London department store. The defendants are 60 Internet domain names ("Domain Names" or "Names") registered in Herndon, Virginia, by Harrods (Buenos Aires) Limited ("Harrods BA"). Harrods BA, once affiliated with Harrods UK, is now a completely separate corporate entity that until recently operated a "Harrods" department store in Buenos Aires, Argentina. Harrods UK sued the 60 Domain Names under 15

U.S.C. § 1125(d)(2), the in rem provision of the recently enacted Anticybersquatting Consumer Protection Act (ACPA), Pub.L. No. 106–113, 113 Stat. 1501A–545 (codified in scattered sections of 15 U.S.C.) (1999). Harrods UK alleged that the Domain Names infringed and diluted its American "Harrods" trademark and that Harrods BA registered the Names in bad faith as prohibited by 15 U.S.C. § 1125(d)(1).[1] The district court dismissed the infringement and dilution claims, holding that in rem actions could only be maintained for bad faith registration claims under § 1125(d)(1). As discovery was just beginning, the district court granted summary judgment to six of the Domain Names on Harrods UK's bad faith registration claim. After full discovery and a bench trial, the court awarded judgment to Harrods UK against the remaining 54 Domain Names and ordered those names to be transferred to Harrods UK. Both sides now appeal. For the reasons that follow, we affirm the judgment as to the 54 Domain Names, reverse the dismissal of Harrods UK's infringement and dilution claims, reverse the grant of summary judgment to the six Domain Names, and remand for further proceedings.

## I.

Harrods UK and its predecessors have operated a department store named "Harrods" in the Knightsbridge section of London, England, since 1849. In 1912 Harrods UK created a wholly owned sub-sidiary, Harrods South America Limited, to carry on business in South America. Harrods South America Limited created Harrods BA as an independent company, and in 1914 Harrods BA opened a department store under the name "Harrods" in a new building in downtown Buenos Aires designed to look like Harrods UK's historic London building. Over the following decades Harrods BA registered "Harrods" as a trademark in Argentina, Brazil, Paraguay, Venezuela, and a number of other South American countries. Harrods UK and Harrods BA quickly drifted apart: by the 1920s Harrods BA was operating largely independently of Harrods UK, and the last remaining legal ties between the two companies were severed in 1963.

In the early 1990s Harrods UK and Harrods BA entered into negotiations for Harrods UK to buy Harrods BA's South American trademark rights in the name "Harrods." At one point Harrods UK offered $10 million for the rights, but the parties never reached agreement. Later, in 1995, Harrods UK sued Harrods BA in British court, alleging breach of contract, breach of fiduciary duty, and passing off, all arising from Harrods BA's use of the name "Harrods" in South America.[2] The British High Court of Justice, Chancery Division, dismissed the contract and fiduciary duty claims against Harrods BA, and this decision was affirmed in 1998 by the Court of Appeal, Civil Division. *Harrods*

---

1. Harrods UK actually brought four claims against the Domain Names under various sections of Title 15. Count One alleged infringement of a registered mark under § 1114. Count Two alleged dilution of a famous mark under § 1125(c). Count Three alleged bad faith registration under § 1125(d)(1). Count Four alleged unfair competition under § 1125(a), which, roughly speaking, is an infringement claim that can be brought regardless of whether the mark is registered. *See* 4

J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 27:14 (4th ed.2002). We will refer to Harrods UK's claims under § 1114 and § 1125(a) together as a claim for infringement.

2. "Passing off" is a common law unfair competition tort and was the precursor to modern unfair competition legislation, such as the Lanham Act. *See* 1 McCarthy §§ 5:2–5:4.

*Ltd. v. Harrods (Buenos Aires) Ltd.,*
[1997] F.S.R. 420(Ch.), *aff'd,* [1999] F.S.R.
187 (C.A.). The Court of Appeal held that
Harrods BA had an implied contractual
right to carry on business under the name
"Harrods" anywhere in South America.
Neither British court ruled on the passing
off claim because that claim was with-
drawn by Harrods UK on the condition
that Harrods BA limit its business to
South America. Here, we have not been
asked to conclusively determine the legiti-
macy and scope of Harrods BA's rights in
the name "Harrods" throughout South
America. It appears, however, that Har-
rods BA has the right to use the name
"Harrods" in Argentina and much of South
America, and for the limited purposes of
this litigation Harrods UK does not at-
tempt to prove otherwise.

Harrods UK, for its part, has exclusive
trademark rights in the name "Harrods" in
much of the rest of the world, including
the United States, where retail catalog and
Internet sales generate millions of dollars
in revenue each year. Harrods UK's re-
tail business has thrived in recent years,
but Harrods BA's business has been in
decline since the early 1960s. Over the
years, Harrods BA occupied less and less
of its large Buenos Aires department store
building and leased more and more of the
space to other vendors. Some time
around 1998 Harrods BA ended its depart-
ment store operation entirely, and the
building now sits vacant. Harrods BA's
only current revenue is about $300,000 an-
nually from the continued operation of the
building's parking garage.

In February of 1999 Harrods UK
launched a website at the domain name
harrods.com, and the website became a
functioning online retail store in November
of 1999. Harrods BA executives testified
that sometime in 1999 they also began
planning to launch a Harrods store on the
Internet. Toward that end, Harrods BA
hired a consultant, a Mr. Capuro, to pre-
pare a proposal for an online business. In
the fall of 1999, around the same time that
Harrods UK was launching its Internet
business (and announcing this in the
press), Harrods BA began registering the
first of what eventually became around 300
Harrods-related domain names. The 60
Domain Names that are defendants in this
case were registered with Network Solu-
tions, Inc. (NSI), a domain name registry
located in Herndon, Virginia. At that time
NSI served as the exclusive worldwide
registry for domain names us-
ing .com, .net, and .org.[3]

A brief explanation of the nature and
terminology of Internet domain names is
warranted before we continue with the
details of Harrods BA's domain name reg-
istrations. A domain name is the "ad-
dress" at which a computer user accesses a
website on the Internet.[4] A typical do-
main name is www.ca4.uscourts.gov, which
is the domain name for the website of the
United States Court of Appeals for the
Fourth Circuit. Domain names consist of
sections of alpha-numeric characters sepa-
rated by periods, called "dots." These sec-
tions are referred to, working from right
to left, as the top-level domain, the second-
level domain, and so on. The top-level
domain is the ending suffix, such as .gov
(as in ca4.uscourts.gov) or .com (as in vw.
com). The second-level domain is the sec-
tion just to the left of the top-level domain
(in the above examples, uscourts and vw

---

**3.** In June of 2000 NSI became a wholly
owned subsidiary of VeriSign, Inc., and Veri-
Sign continues to serve as the exclusive
worldwide registry for .com, .net, and .org
domain names.

**4.** For a useful glossary of Internet and do-
main name terminology, see http://www.veri-
sign-grs.com/glossary/.

serve as the second-level domains). For obvious reasons, most companies want their primary trademark to serve as their second-level domain, as in vw.com for Volkswagen of America. *See Virtual Works, Inc. v. Volkswagen of Am., Inc.,* 238 F.3d 264 (4th Cir.2001).

Harrods BA registered each of its Harrods-related domain names under the .com, .net., and .org top-level domains. For example, Harrods BA registered the second-level domain harrodsbuenosaires as harrodsbuenosaires.com, harrodsbuenosaires.net, and harrodsbuenosaires.org. This case involves 20 distinct second-level domain names, each registered under the three top-level domains .com, .net, and .org, for a total of 60 defendant Domain Names.[5] All told, Harrods BA registered about 300 Harrods-related domain names in the United States. The 20 second-level domain names at issue in this case are harrodsbuenosaires, harrodsargentina, harrodssudamerica, harrodssouthamerica, harrodsbrasil, harrodsbrazil, harrodsamerica, tiendaharrods, cyberharrods, ciberharrods, harrodsbank, harrodsbanking, harrodsfinancial, harrodsservices, harrodsvirtual, harrodsstore, shoppingharrods, harrodsshopping, harrodsbashopping, and harrodsshoppingba.

We now return to the events leading up to this lawsuit. In December of 1999 Capuro finished his proposal for Harrods BA's online business. The report suggested using the Harrods-related domain names registered by Harrods BA to set up a website portal where users could shop at various stores within the Harrods BA website. This suggested arrangement was much like the physical Harrods department store in Buenos Aires, where Har-

rods BA had until recently housed a number of vendors (who were lessees) in its famous four-story building under the umbrella of the Harrods name. Under the proposal Harrods BA would not sell any merchandise itself but would simply earn commissions from vendors that it sponsored. The proposal thus treated the well-known Harrods name as the primary asset that Harrods BA could offer vendors to induce them to join the Harrods portal site and pay commissions. The report included an illustration of a transaction occurring through the proposed Harrods BA website. The illustration shows an online shopper designated as a "UK citizen" purchasing a Burberry sweater (a British brand) at the Harrods BA website and paying for the purchase with funds from Barclays Bank (a British bank). The "Harrods" logo on the webpage illustration is not the distinct "Harrods" logo used by Harrods BA; instead, it is identical to the script logo long used by Harrods UK. Harrods BA used this proposal to solicit potential investors and partners in Argentina, the United States, and Europe (mostly via the Internet). No party expressed interest, and by January of 2000 Harrods BA had rejected the Capuro proposal and had solicited Ernst & Young to prepare a new business plan. The Ernst & Young plan was not introduced or described at trial.

On February 16, 2000, Harrods UK sued 60 of the Harrods-related domain names in the United States District Court for the Eastern District of Virginia. Harrods UK sued under 15 U.S.C. § 1125(d)(2), which permits the owner of a protected mark to bring an in rem action against domain names that violate "any right of the owner of a mark," subject to certain limitations.

---

5. For simplicity's sake we will refer to the names by the second-level domains, such as harrodsbuenosaires, with the understanding that this reference encompasses the three permutations of that second-level domain created by combining it with the three top-level domains, .com, .net, and .org.

For example, the in rem action is available only when the plaintiff cannot find or cannot obtain personal jurisdiction over the domain name registrant.[6] Harrods UK claimed that the Domain Names violated 15 U.S.C. § 1125(d)(1), which prohibits bad faith registration of domain names with intent to profit, and 15 U.S.C. §§ 1114, 1125(a) & (c), which together prohibit trademark infringement and dilution. Harrods BA was easily identified as the registrant of the defendant Domain Names, but the mere act of registering the Domain Names in Virginia was deemed insufficient to provide personal jurisdiction over Harrods BA. *See, e.g., Heathmount A.E. Corp. v. Technodome.com,* 106 F.Supp.2d 860, 866–69 (E.D.Va.2000). Because Harrods UK could not obtain personal jurisdiction over Harrods BA, the suit was filed in rem against the 60 Domain Names themselves.

The initial complaint did not allege bad faith registration on the part of Harrods BA. The Domain Names moved to dismiss, arguing that bad faith must be pled and proven in all cases filed under the in rem provision of the ACPA, § 1125(d)(2). The district court dismissed the infringement and dilution claims with prejudice, holding that § 1125(d)(2) provided in rem jurisdiction only for bad faith claims under § 1125(d)(1). The court also dismissed without prejudice Harrods UK's bad faith registration claim under § 1125(d)(1) because the complaint failed to allege bad faith. Harrods UK promptly filed an amended complaint, this time alleging bad faith under § 1125(d)(1). Before discovery

got under way, the Domain Names moved for summary judgment as to just six of the names, specifically the .com, .net, and .org permutations of harrodsbuenosaires and harrodsargentina (the "Argentina Names"). The district court granted summary judgment to the Argentina Names, reasoning that Harrods BA had legitimate trademark rights in Argentina and that these Names on their face were clearly identified as Buenos Aires- and Argentina-related.

After extensive discovery and a bench trial, the district court found bad faith intent to profit on the part of Harrods BA with respect to the remaining 54 Domain Names and ordered that those names be transferred to Harrods UK. (Forfeiture, cancellation and transfer of domain names are the only remedies available under the in rem provision. 15 U.S.C. § 1125(d)(2)(D)(i).) Harrods UK appeals the district court's order dismissing its infringement and dilution claims and the order granting summary judgment to the six Argentina Names. The Domain Names appeal the court's order entering judgment after trial for Harrods UK against the remaining 54 Domain Names.

II.

The central issue for both the six Argentina Names and the other 54 Names is whether Harrods BA registered the Domain Names in bad faith as that term is outlined by the ACPA. Ultimately, we conclude that the district court did not err in holding that Harrods BA registered the 54 Names in bad faith, but the court did err

---

**6.** Section 1125(d)(2) actually says that the in rem action is available only when the plaintiff cannot find or obtain personal jurisdiction over "a person who would have been a defendant in a civil action under paragraph (1)." 15 U.S.C. § 1125(d)(2)(A)(ii). The reference to paragraph (1) means § 1125(d)(1), which applies to a person who "registers, traffics in,

or uses a domain name" with the bad faith intent to profit. 15 U.S.C. § 1125(d)(1)(A)(ii). For simplicity's sake, we will refer to § 1125(d)(1) as covering the registration of a domain name in bad faith, but we acknowledge that the section also applies to bad faith trafficking or use.

in granting summary judgment to the six Argentina Names before Harrods UK had an adequate opportunity for discovery. Before we deal with the issue of bad faith registration, we must consider several other issues raised by the parties. First, the Domain Names assert a due process challenge to the district court's in rem jurisdiction on the ground that the Names lack sufficient minimum contacts with the forum. Second, the Domain Names argue that claims of bad faith under § 1125(d)(1) must be proven by clear and convincing evidence, not by a preponderance of the evidence, which is the usual standard. For its part, Harrods UK argues that § 1125(d)(2) provides in rem jurisdiction not only for violations of § 1125(d)(1) but also for other trademark violations, such as infringement and dilution. We conclude that the district court properly exercised jurisdiction over the Domain Names and that the normal preponderance of the evidence standard applies to bad faith claims under § 1125(d)(1). We further conclude that a plaintiff bringing an in rem action under § 1125(d)(2) may, in appropriate circumstances, pursue infringement and dilution claims as well as bad faith registration claims under § 1125(d)(1). We discuss these issues here in part II, and then in part III we discuss the question of Harrods BA's alleged bad faith.

A.

On appeal the Domain Names claim that the district court's exercise of in rem jurisdiction over them violates the Due Process Clause because they lack sufficient minimum contacts with the forum. The Due Process clause of the Fifth Amendment permits a federal court to exercise personal jurisdiction over a defendant only if that defendant has "certain minimum contacts with [the forum] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945) (*quoting Milliken v. Meyer*, 311 U.S. 457, 463, 61 S.Ct. 339, 85 L.Ed. 278 (1940)). "[T]he minimum contacts rule of *International Shoe* ... applie[s] to actions *in rem* and *quasi in rem*, as well as to actions *in personam.*" *Pittsburgh Terminal Corp. v. Mid Allegheny Corp.*, 831 F.2d 522, 526 (4th Cir.1987) (construing *Shaffer v. Heitner*, 433 U.S. 186, 97 S.Ct. 2569, 53 L.Ed.2d 683 (1977)). Accordingly, we apply the minimum contacts test to the district court's exercise of in rem jurisdiction over the Domain Names. Under this test we ask whether there has been "some act by which the defendant purposefully avail[ed] itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Hanson v. Denckla*, 357 U.S. 235, 253, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958). A federal district court can exercise personal and in rem jurisdiction to the same extent as courts in the state where the district court is located. Thus, to determine whether the Domain Names have sufficient minimum contacts to justify the exercise of in rem jurisdiction by the district court in this case, we must determine whether the Domain Names have sufficient contacts with the Commonwealth of Virginia to justify the exercise of in rem jurisdiction by the courts of Virginia. *See ESAB Group, Inc. v. Centricut, Inc.*, 126 F.3d 617, 622 (4th Cir.1997).

In the case of disputes involving property, the presence of the property in the jurisdiction does not *always* justify the exercise of in rem jurisdiction, but "when claims to the property itself are the source of the underlying controversy between the plaintiff and the defendant, it would be unusual for the State where the property is located not to have jurisdiction." *Shaf-*

*fer*, 433 U.S. at 207, 97 S.Ct. 2569 (internal footnote omitted). *See also* 4A Charles A. Wright & Arthur R. Miller, *Federal Practice & Procedure* § 1072 (3d ed.2002). Specifically, the Supreme Court said in *Shaffer* that in rem jurisdiction is appropriate in "suits for injury suffered on the land of an absentee owner, where the defendant's ownership of the property is conceded but the cause of action is otherwise related to rights and duties growing out of that ownership." *Shaffer*, 433 U.S. at 208, 97 S.Ct. 2569. The dispute in this case is roughly analogous to such a suit. Harrods UK has allegedly suffered injury by way of property, the Domain Names, owned by Harrods BA, an absentee owner. Harrods BA's initial ownership of the Names is conceded, but the cause of action is related to Harrods BA's rights and duties arising out of that ownership.

■ Likewise, Virginia's "interests in assuring the marketability of property within its borders and in providing a procedure for peaceful resolution of disputes about the possession of that property" also support the exercise of in rem jurisdiction in this case. *Id.* (internal footnote omitted). Moreover, Virginia's interest in not permitting foreign companies to use rights emanating from, and facilities located in, its territory to infringe U.S. trademarks also supports the exercise of in rem jurisdiction. By registering these Domain Names in Virginia, Harrods BA exposed those Names to the jurisdiction of the courts in Virginia (state or federal) at least for the limited purpose of determining who properly owns the Domain Names themselves. This is not a case where "the only role played by the property is to provide the basis for bringing the defendant into court." *Id.* at 209, 97 S.Ct. 2569. Rather, because "claims to the property itself are the source of the underlying controversy," *id.* at 207, 97 S.Ct. 2569, and because Virginia has important interests in exercising jurisdiction over that property (the Names), we conclude that courts in Virginia, the state where the Domain Names are registered, may constitutionally exercise in rem jurisdiction over them. Thus, the district court's exercise of in rem jurisdiction over the Domain Names was constitutional.[7]

### B.

■ The Domain Names argue that proving bad faith under § 1125(d)(1) requires proof by clear and convincing evidence rather than by a preponderance of the evidence, the usual standard. The district court concluded that the preponderance of the evidence standard applies, and we agree. We can find no other cases discussing the proper standard of proof under the ACPA, so we are the first to take a direct crack at the question. We note, however, that none of the courts applying the ACPA have mentioned a heightened burden of proof. *See, e.g., People for the Ethical Treatment of Animals v. Doughney*, 263 F.3d 359 (4th Cir.2001); *Virtual Works*, 238 F.3d 264; *Sporty's Farm L.L.C. v. Sportsman's Market, Inc.*, 202 F.3d 489 (2d Cir.2000). This suggests,

---

**7.** The Domain Names also argue that domain names do not constitute a form of property over which in rem jurisdiction can be exercised. The Domain Names have waived this objection to the district court's in rem jurisdiction by failing to raise it before the district court. *See United States v. Republic Marine, Inc.* 829 F.2d 1399, 1401–05 (7th Cir.1987); 5A Charles A. Wright & Arthur R. Miller, *Federal Practice & Procedure* § 1351, at 245–47 (2d ed.1990). Accordingly, we will not address the issue. We note that the issue of whether domain names constitute a form of property for the purpose of in rem jurisdiction is dealt with in *Porsche Cars North Am., Inc. v. Porsche.net*, 302 F.3d 248 (4th Cir. 2002).

at the very least, that courts have assumed that the usual preponderance of the evidence standard applies to bad faith claims under the ACPA.

■ The Supreme Court has explained that under "[c]onventional rules of civil litigation ... parties ... need only prove their case by a preponderance of the evidence" and that "[e]xceptions to this standard are uncommon." *Price Waterhouse v. Hopkins*, 490 U.S. 228, 253, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989) (plurality opinion). "Because the preponderance-of-the-evidence standard results in a roughly equal allocation of the risk of error between litigants, we presume that this standard is applicable in civil actions between private litigants unless 'particularly important individual interests or rights are at stake.'" *Grogan v. Garner*, 498 U.S. 279, 286, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991) (quoting *Herman & MacLean v. Huddleston*, 459 U.S. 375, 389, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983)). The Supreme Court has applied a heightened standard of proof in proceedings to terminate parental rights, involuntary commitment proceedings, and deportation proceedings. *See Herman*, 459 U.S. at 389, 103 S.Ct. 683 (listing cases). The interests implicated by the cybersquatting provision of the ACPA are important, but they are not in the same category as those listed in *Herman*.

The Domain Names argue that even if this case does not involve "particularly important individual interests" of the type referred to in *Herman*, the clear and convincing standard still applies because § 1125(d)(1) requires proof of bad faith. Indeed, in *Addington v. Texas*, 441 U.S. 418, 424, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979), the Supreme Court acknowledged that "[o]ne typical use of the [clear and convincing] standard is in civil cases involving allegations of fraud or some other

quasicriminal wrongdoing by the defendant." A leading treatise adds that "[n]ot all instances of requirements of proof more than [by a preponderance of the evidence] concern cases involving individual liberty." 2 *McCormick on Evidence* § 340, at 426 (John W. Strong et al. eds., 5th ed.1999). In addition to cases involving the important interests of individual liberty, "this special standard of persuasion commonly has been applied [to, among other things,] ... charges of fraud." *Id.* The Domain Names argue that the clear and convincing standard of proof should apply because the bad faith element of § 1125(d)(1) is equivalent to an element of fraud.

We acknowledge that the clear and convincing evidence standard has been applied in certain cases involving fraudulent or bad faith conduct. *See, e.g., Grossman v. Comm'r of Internal Revenue*, 182 F.3d 275, 277 (4th Cir.1999) (clear and convincing evidence required to prove intent to defraud in civil tax fraud case under the Internal Revenue Code); *Shepherd v. ABC*, 62 F.3d 1469, 1477–78 (D.C.Cir.1995) (litigation misconduct must be proven by clear and convincing evidence in order for the district court to enter default judgment as a sanction for such misconduct). Indeed, courts have required clear and convincing evidence for the proof of certain fraud-based claims under the Lanham Act, such as a claim of fraudulent registration or a claim for attorneys' fees when the infringer's conduct was fraudulent or in bad faith. *See Resorts of Pinehurst, Inc. v. Pinehurst Nat'l Corp.*, 148 F.3d 417, 420 (4th Cir.1998) (fraudulent registration); *Pebble Beach Co. v. Tour 18 I Ltd.*, 155 F.3d 526, 555 (5th Cir.1998) (attorneys' fees). The heightened burden of proof was imposed in these instances by the courts and not by the text of the Lanham Act. But while clear and convincing evidence is required for some fraud-based

claims, in many instances a heightened burden of proof is not required. *See, e.g., Grogan,* 498 U.S. at 288–89, 111 S.Ct. 654 (listing federal fraud-related statutes to which the preponderance standard applies); *United States v. Truesdale,* 211 F.3d 898, 908 (5th Cir.2000) (criminal defendants whose convictions were reversed must show by a preponderance of the evidence that the government's position was in bad faith in order to recover attorneys' fees under the Hyde Amendment); *Donald v. Liberty Mut. Ins. Co.,* 18 F.3d 474, 484 (7th Cir.1994) (under Indiana law, tort of bad faith dealing by an insurer is proved by a preponderance of the evidence). Moreover, the Supreme Court has applied the presumption that the preponderance standard applies even in civil cases that involve fraud. For example, in *Grogan* the Court held that a claim that a debt was incurred through actual fraud, which would exempt the debt from general discharge under the Bankruptcy Act, need only be proven by a preponderance of the evidence. *Grogan,* 498 U.S. at 290–91, 111 S.Ct. 654.

We can see no clear, overarching principle that separates the fraud or bad faith claims requiring proof by clear and convincing evidence from those fraud or bad faith claims requiring proof by a preponderance of the evidence. Even so, the Supreme Court's analysis of the relevant standard of proof in *Herman* does provide some guidance. The Court explained that the heightened burden of proof requirement arose out of a concern by courts of equity that charges of fraud could be fabricated too easily. *Herman,* 459 U.S. at 388 n. 27, 103 S.Ct. 683. This concern, the Court reasoned, is not necessarily valid when modern statutes are involved. In this case, for example, guidelines for establishing the element of bad faith under the ACPA are set forth and explained in detail both in the statute and in the legislative

history. As we discuss fully in part III, *infra,* § 1125(d)(1)(B)(i) contains nine factors to guide courts in determining whether bad faith exists in a given case. These factors include, among other things, any trademark rights of either party in the domain name, any bona fide prior use of the domain name, and any offer by the registrant to sell the domain name to the owner of the mark in question. 15 U.S.C. §§ 1125(d)(1)(B)(i)(I), (III), (VI) & (IX). The nine factors are also explained at length in the legislative history to the ACPA. *See, e.g.,* Sen. Rep. No. 106–140, at 13–16 (1999); H.R.Rep. No. 106–412, at 10–13 (1999). The detailed guidelines for proving a claim of bad faith registration under the ACPA relieve the worry that claims can be easily fabricated, the worry that motivated courts of equity to impose a higher burden of proof in routine fraud cases. Because Congress spelled out the bad faith factors so thoroughly, we expect that Congress would have explicitly imposed a heightened burden of proof had it intended for one to apply. In *Grogan* the Supreme Court explained that "silence [in the text and the legislative history of the bankruptcy code] is inconsistent with the view that Congress intended to require a special, heightened standard of proof." *Grogan,* 498 U.S. at 286, 111 S.Ct. 654. Faced with a similar silence in the ACPA's text and legislative history, both of which explain the bad faith requirement in detail, we conclude that the usual preponderance of the evidence standard applies to claims of bad faith registration of domain names under § 1125(d)(1).

### C.

▇ The final issue we must consider before reaching the question of bad faith is the scope of the in rem provision of the ACPA, 15 U.S.C. § 1125(d)(2). Harrods UK argues that § 1125(d)(2) provides for

in rem jurisdiction against domain names for traditional infringement and dilution claims under §§ 1114, 1125(a) & (c) as well as for claims of bad faith registration with the intent to profit under § 1125(d)(1). The Domain Names argue that the district court correctly limited the scope of the in rem provision to claims under § 1125(d)(1) for bad faith registration of a domain name with the intent to profit. This argument has not yet been settled by any federal circuit court. Only a handful of district courts have considered the issue, and most of them agree with the district court here that § 1125(d)(2) applies only to violations of § 1125(d)(1), bad faith registration with intent to profit. *See Cable News Network L.P. v. CNNEWS.com*, 177 F.Supp.2d 506, 522–23 (E.D.Va.2001); *Hartog & Co. v. SWIX.com*, 136 F.Supp.2d 531, 539–40 (E.D.Va.2001); *BroadBridge Media, L.L.C. v. Hypercd.com*, 106 F.Supp.2d 505, 511 (S.D.N.Y.2000). At least one district court and two commentators have endorsed the contrary view that § 1125(d)(2) authorizes an in rem action for the violation of several substantive provisions of federal trademark law. *See Jack in the Box, Inc. v. Jackinthebox.org*, 143 F.Supp.2d 590, 591 (E.D.Va.2001); 4 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 25:79, at 25–290 (4th ed.2002); Jonathan S. Jennings, *Significant Trademark/Domain Name Issues in Cyberspace*, 663 PLI/Pat 649, 664 (2001). While we consider this to be a close question of statutory interpretation, we ultimately conclude that § 1125(d)(2) is not limited to violations of § 1125(d)(1); it also authorizes in rem actions for certain federal infringement and dilution claims.

We begin our analysis with the text of the statute. Section 1125(d)(2)(A) provides that the "owner of a mark" may file an in rem action against a domain name if:

> (i) the domain name violates any right of the owner of a mark registered in the Patent and Trademark Office, or protected under subsection (a) [infringement] or (c) [dilution]; and
>
> (ii) . . . the owner—
>
> > (I) is not able to obtain in personam jurisdiction over a person who would have been a defendant in a civil action under paragraph (1) [§ 1125(d)(1)]; or
> >
> > (II) through due diligence was not able to find a person who would have been a defendant in a civil action under paragraph (1). . . .

15 U.S.C. § 1125(d)(2)(A). We start with the first clause, subsection (d)(2)(A)(i), which provides that an in rem action is available if "(i) the domain name violates *any right* of the owner of a mark registered in the Patent and Trademark Office, or protected under subsection (a) or (c)." 15 U.S.C. § 1125(d)(2)(A)(i) (emphasis added). The broad language "any right of the owner of a mark" does not look like it is limited to the rights guaranteed by subsection (d)(1), but appears to include any right a trademark owner has with respect to the mark. This language, by itself, would include rights under § 1125(d)(1), and it would also include, for example, rights under § 1125(a) against trademark infringement and rights under § 1125(c) against trademark dilution. If Congress had intended for subsection (d)(2) to provide in rem jurisdiction only for subsection (d)(1) claims, it could easily have said so directly. For example, Congress could have said that an in rem action is available if "the domain name violates subsection (d)(1)." Again, if the first key phrase Congress gave us—"any right of the owner of a mark"—is considered in isolation, it would authorize the in rem pursuit of any of the actions that could be brought in personam under U.S. trademark law, including infringement (subsection (a)), dilution (sub-

section (c)), and cybersquatting (subsection (d)(1)). *See* 4 McCarthy § 25:79, at 25–290; Jennings, *supra*, at 664.

Of course, subsection (d)(2)(A)(i) does not create a claim for the owner of *any* mark, but rather for the owner of "a mark registered in the Patent and Trademark Office [PTO], or protected under subsection (a) or (c)." Thus, to understand the scope of subsection (d)(2)(A)(i), we must also consider the implications of this additional language. Generally speaking, trademark protection is a common law right that arises from the use of a mark to identify the source of certain goods or services. *Brittingham v. Jenkins*, 914 F.2d 447, 452 (4th Cir.1990); 3 McCarthy § 19:3. By its terms, subsection (d)(2)(A)(i) does not provide an in rem action for the owner of *any* type of mark protected under trademark law, but only for the owner of a mark that is either (1) registered in the PTO or (2) protected under §§ 1125(a) or (c).

■ First, we consider the protection offered a mark registered in the PTO. The owner of a mark may register that mark with the PTO. 15 U.S.C. § 1051. While it is the use of a mark, not its registration, that confers trademark protection, *Brittingham*, 914 F.2d at 452, registration does confer certain benefits on the owner; for example, it serves as prima facie evidence of the mark's validity. *Id.;* 15U.S.C. § 1057(b). Subsection (d)(2)(A)(i) provides an additional benefit for registration of a mark: registration now entitles the owner of the mark to proceed on an in rem basis under § 1125(d)(2). The rights of an owner whose mark is registered in the PTO are not limited to rights under § 1125(d)(1), however. They also include, for example, rights against infringement of a registered mark under § 1114.

Second, subsection (d)(2)(A)(i) ends with the provision that even if a mark is not registered, the mark's owner may proceed on an in rem basis under § 1125(d)(2) if the mark is "protected under subsection (a) or (c)." Subsections (a) and (c) are the infringement and dilution provisions of § 1125. Because subsection (d)(2) provides for an in rem action for the violation of "any right ... of a mark ... protected under subsection (a) or (c)," it seems to provide in rem jurisdiction over a domain name that infringes a mark under § 1125(a) or dilutes a famous mark under § 1125(c). *See* Jennings, *supra*, at 664 ("The explicit language of the in rem provision ... suggests a broader application [than just subsection (d)(1) claims], by stating that it protects against domain names violating the rights of owners of marks registered in the PTO, or protected under Section 43(a) or Section 43(c) of the Lanham Act."). The Domain Names do not offer a competing interpretation of this last provision of subsection (d)(2)(A)(i) that reconciles this provision with their argument that subsection (d)(2) applies only to bad faith claims under subsection (d)(1). If in rem jurisdiction is only available for subsection (d)(1) bad faith claims, we cannot understand why Congress described the types of marks covered under subsection (d)(2) as those "registered in the [PTO], or protected under subsection (a) or (c)." Subsection (d)(2)(A)(i)'s reference to a mark "registered in the [PTO], or protected under subsection (a) or (c)" reinforces our sense that the phrase "any right" includes more than just subsection (d)(1) rights.

According to the Domain Names, the problem with interpreting subsection (d)(2) as covering more than just bad faith claims under subsection (d)(1) is that subsection (d)(2)(A)(ii) conditions the availability of in rem jurisdiction on proof that the plaintiff is unable to find or obtain personal jurisdiction over the "person who would have

been a defendant in a civil action [for bad faith registration] under paragraph (1)," that is, § 1125(d)(1). As the district court explained, "because Congress chose to include in the *in rem* action the definition of potential defendants used in paragraph (1), we must therefore conclude that Congress intended for the 'bad faith intent to profit' element to be part of any *in rem* action." *Harrods Ltd. v. Sixty Internet Domain Names*, 110 F.Supp.2d 420, 426 (E.D.Va. 2000). We realize that it is possible to get the impression from reading subsection (d)(2)(A)(ii) that the in rem action is available only for subsection (d)(1) violations. But it is important to distinguish between the language discussing the subject matter covered by the in rem provision and the language discussing the proper defendant in a cybersquatting case. Subsection (d)(2)(A)(i) deals with the former, and subsection (d)(2)(A)(ii) deals with the latter. Subsection (d)(2)(A)(i) identifies the substantive rights actionable under the in rem provision, stating in broad terms that the in rem provision protects "any right of the owner of a mark" that is registered in the PTO or "protected under subsection (a) or (c)." Subsection (d)(2)(A)(ii) deals with the proper defendant to a cybersquatting claim, stating that in rem jurisdiction is available only when personal jurisdiction over the registrant is lacking. It would be odd for Congress to have placed a significant limitation on the scope of the substantive rights identified in subsection (d)(2)(A)(i), which deals with the subject matter of in rem actions, by indirectly tacking something on to subsection (d)(2)(A)(ii), which deals with the proper defendant in cybersquatting actions.

If the only way to understand the phrase "a person who would have been a defendant in a civil action under paragraph (1)" was as a reference to subsection (d)(1)'s bad faith requirement, we would be forced to confront the tension between this language and subsection (d)(2)(A)(i)'s broad language of "any right of the owner of a mark." However, the phrase "a person who would have been a defendant in a civil action under paragraph (1)" can fairly be understood as a short-hand reference to the current registrant of the domain name. *See* 4 McCarthy § 25:79, at 25–290 (This reference to paragraph (1) "does not add an extra element" to subsection (d)(2), but simply "defines the proper defendant in an in rem proceeding as the present domain name registrant."). This reading avoids tension with subsection (d)(2)(A)(i)'s reference to "any right of the owner of a mark," which does not appear to be limited to rights protected by subsection (d)(1).

Nonetheless, it is possible to disagree about the meaning of the phrase "a person who would have been a defendant in a civil action under paragraph (1)." As noted above, the district court understood this language not as a shorthand reference to the current domain name registrant, but as limiting in rem jurisdiction to subsection (d)(1) bad faith claims. *Harrods Ltd.*, 110 F.Supp.2d at 426. Because the meaning of this phrase in conjunction with the phrase "any right of the owner of a mark" is not altogether clear, it is appropriate to "look to the legislative history for guidance in interpreting the statute." *United States v. Childress*, 104 F.3d 47, 53 (4th Cir.1996). The legislative history confirms that the phrase "a person who would have been a defendant in a civil action under paragraph (1)" should be read as a shorthand reference to the domain name registrant, not as requiring a bad faith element in all in rem actions. The House Report says that "in rem jurisdiction is ... appropriate in instances where personal jurisdiction cannot be established over the domain name registrant." H.R.Rep. No. 106–412, at 14 (1999). The registrant is the person who would be the defendant both in a

subsection (d)(1) bad faith registration action and in a traditional infringement or dilution action involving the improper use of a domain name.

The Domain Names do not give up easily. They point to other legislative history that describes the general purpose of the ACPA in terms of outlawing "cybersquatting," which is always discussed as bad faith registration with intent to profit. For example, the Senate Judiciary Committee report on the ACPA opens by explaining that "the purpose of the bill" is to protect consumers and businesses by "prohibiting the bad-faith and abusive registration of distinctive marks as Internet domain names with the intent to profit from the goodwill associated with such marks— a practice commonly referred to as 'cybersquatting.'" Sen. Rep. No. 106–140, at 4 (1999). *See also* H.R.Rep. No. 106–412, at 6. As the district court explained, this might suggest that the entire bill, including both subsection (d)(1) and subsection (d)(2), is aimed solely at bad faith registration with the intent to profit. *See Harrods,* 110 F.Supp.2d at 426; *see also CNN,* 177 F.Supp.2d at 523 ("The ACPA's purpose is . . . to deter, prohibit and remedy 'cyberpiracy,' which is defined in the legislative history as the *bad faith* registration or use of a domain name . . . [and] [t]his purpose is given proper effect by resolving the ambiguity in favor of requiring bad faith in ACPA in rem actions.").

This reading of the language describing the general purpose of the ACPA is trumped, however, by the language Congress used when it discussed the purpose of subsection (d)(2) specifically. The Senate Report states that the in rem jurisdiction provision "allows a mark owner to seek the forfeiture, cancellation, or trans-fer of an infringing domain name by filing an in rem action against the name itself, provided the domain name itself violates *substantive Federal trademark law.*" Sen. Rep. No. 106–140, at 10 (emphasis added). *See also* H.R.Rep. No. 106–412, at 14 (containing a statement that is nearly verbatim). Later on, the Senate Report notes that the in rem provision allows trademark owners to "proceed against the domain names themselves, provided they are, in fact, *infringing or diluting under the Trademark Act.*" Sen. Rep. No. 106–140, at 11 (emphasis added). Elsewhere, the in rem provision is described as authorizing an injunction against a domain name "provided the mark owner can show that the domain name itself violates substantive federal trademark law (i.e., that the domain name violates the rights of the registrant of a mark registered in the Patent and Trademark Office, or section 43(a) or (c) of the Trademark Act)." 145 Cong. Rec. S14,714 (daily ed. Nov. 17, 1999).[8] This language from the legislative history is not framed in terms of subsection (d)(1) or bad faith; it does not say the in rem action is available if the domain name violates the substantive cybersquatting provision of the ACPA. Rather, it says the in rem action is available for domain names that violate "substantive Federal trademark law" or which are "infringing or diluting under the Trademark Act." Sen. Rep. No. 106–140, at 10–11. Thus, when the legislative history addresses subsection (d)(2) specifically, it speaks in terms of violations of trademark law generally and of subsections (a) and (c); it does not repeat the references to bad faith registration that appear elsewhere. Just like the text of subsection (d)(2)(A)(i), this language in the legislative history suggests

---

**8.** For parallel statements from the House of Representatives for this and our subsequent citations to the Congressional Record, see the discussion of the ACPA appearing in 145 Cong. Rec. H11,769 (daily ed. Nov. 9, 1999).

that the in rem action is available to enforce several of the substantive provisions of Federal trademark law.

On balance, we are left with the following. On its face, subsection (d)(2)(A)(i) provides an in rem action for the violation of "any right" of a trademark owner, not just rights provided by subsection (d)(1). Moreover, subsection (d)(2)(A)(i) authorizes in rem jurisdiction for marks "protected under subsection (a) or (c)," the very subsections underlying two of the claims that were dismissed by the district court as outside the scope of subsection (d)(2). While subsection (d)(2)(A)(ii) provides that the in rem action is available only if the plaintiff is unable to find or obtain personal jurisdiction over the "person who would have been a defendant in a civil action under paragraph (1)," we believe this language is best understood as a shorthand reference to the current registrant of the domain name, who would be the defendant in any trademark action involving a domain name. Finally, the legislative history of the ACPA specifically discussing the in rem provision speaks in terms of domain names that violate "substantive Federal trademark law" or that are "infringing or diluting under the Trademark Act." Sen. Rep. No. 106–140, at 10–11. This reinforces the language of subsection (d)(2)(A)(i), which suggests that the in rem provision is not limited to bad faith claims under subsection (d)(1). Thus, we conclude that the best interpretation of § 1125(d)(2) is that the in rem provision not only covers bad faith claims under § 1125(d)(1), but also covers infringement claims under § 1114 and § 1125(a) and dilution claims under § 1125(c).

In light of this conclusion, we reverse the district court's dismissal of Harrods UK's claims for infringement and dilution and remand for further proceedings on those claims. However, the district court need not consider Harrods UK's infringement and dilution claims as against the 54 Domain Names because we affirm the court's order requiring the transfer of the 54 Names to Harrods UK. Transfer or cancellation of the defendant domain names is the only remedy available under § 1125(d)(2)'s in rem provision, so Harrods UK could gain no additional relief if the court considered and ruled on its infringement and dilution claims against the 54 Names. Thus, on remand the district court need only consider Harrods UK's infringement and dilution claims against the six Argentina Names.

### III.

With the preliminary issues out of the way, we turn at last to Harrods UK's claim alleging bad faith on the part Harrods BA in registering the 60 defendant Domain Names. As explained above, the district court granted summary judgment to the six Argentina Names prior to any meaningful discovery. Then, after discovery and a bench trial, the district court found that Harrods BA had registered the remaining 54 Names with a bad faith intent to profit in violation of § 1125(d)(1). We first consider the district court's finding of bad faith with respect to the 54 Names, and after that we consider the court's award of summary judgment to the six Argentina Names.

### A.

We begin with the district court's determination that the 54 Domain Names were registered by Harrods BA with a bad faith intent to profit. The central provision of the ACPA is § 1125(d)(1), which allows the owner of a protected mark to bring an action against any person who:

(i) has a bad faith intent to profit from that mark ...; and

(ii) registers, traffics in, or uses a domain name that [is identical or confusingly similar to that mark].

15 U.S.C. § 1125(d)(1)(A). The Domain Names do not contest the district court's conclusion that they are identical or confusingly similar to Harrods UK's mark. Rather, the Names argue that the district court erred in concluding that Harrods BA registered the Names with "a bad faith intent to profit from that mark." Section 1125(d)(1)(B)(i) explains that to determine bad faith "a court may consider factors such as, but not limited to," the nine factors listed in § 1125(d)(1)(B)(i)(I)-(IX). After reviewing the district court's thorough consideration of these nine factors, we conclude that the evidence supports the court's finding that Harrods BA had a bad faith intent to profit with regard to the 54 Domain Names. Specifically, the evidence supports the conclusion that Harrods BA intended to use the 54 Domain Names to market its goods and services to non-South American consumers in a manner calculated to divert and deceive consumers seeking to do business with Harrods UK. For the reasons set out in more detail below, we affirm the district court's judgment against the 54 Domain Names.

 Before we look at the nine bad faith factors, we stop for a moment to note that this case presents the unusual situation of two companies named "Harrods," both with legitimate rights to use the "Harrods" name in different geographical regions. The use of an identical mark by two different companies is sometimes allowed in trademark law under the concept of "concurrent use." For example, the Patent and Trademark Office may register the exact same mark for two different users, provided that the use of the mark by both users "is not likely to result" in "confusion, mistake, or deception." 15 U.S.C. § 1052(d). "Even where there is

precise identity of a … mark [used by two persons], there may be no consumer confusion—and thus no trademark infringement—if the alleged infringer is in a different geographic area or in a wholly different industry." *Brookfield Communications, Inc. v. West Coast Entertainment Corp.*, 174 F.3d 1036, 1054 (9th Cir.1999). As we explain below, a concurrent user of a mark that registers a domain name incorporating that mark will always trigger a number of the nine bad faith factors listed in the ACPA. However, the legislative history of the ACPA demonstrates that Congress recognized the legitimacy of concurrent use when it enacted the ACPA and did not intend to disrupt the rights of legitimate concurrent users of a mark. *See, e.g.,* 145 Cong. Rec. S14,713 (daily ed. Nov. 17, 1999) ("there may be concurring uses of the same name that are noninfringing, such as the use of the 'Delta' mark for both air travel and sink faucets. Similarly, the registration of the domain name 'delta-force.com' by a movie studio would not tend to indicate a bad faith intent on the part of the registrant to trade on Delta Airlines or Delta Faucets' trademarks."); *id.* at S14,714 ("[S]omeone who has a legitimate registration of a domain name that mirrors someone else's domain name, such as a trademark owner that is a lawful concurrent user of that name with another trademark owner, may, in fact, wish to sell that name to the other trademark owner."). Accordingly, we should apply the bad faith factors in a manner that will not lead to a finding of bad faith registration every time a concurrent user registers a mark. Of course, even recognizing the rights of concurrent users of a mark, a legitimate concurrent user still violates the other user's trademark rights if it uses the shared mark in a manner that would cause consumer confusion, such as by using the mark in the other's geographic area. *See* 3 McCarthy § 20:82, at 20–140 to 20–141

("the most important [factor in registering concurrent marks] . . . is that such concurrent registration cannot be likely to cause confusion of buyers or others."). Thus, if a concurrent user registers a domain name with the intent of expanding its use of the shared mark beyond its geographically restricted area, then the domain name is registered in bad faith as outlined in the ACPA.[9] With these points noted, we are finally ready to review the district court's evaluation of the 54 Domain Names in light of the nine bad faith factors listed in § 1125(d)(1)(B)(i). There is no simple formula for evaluating and weighing these factors. For example, courts do not simply count up which party has more factors in its favor after the evidence is in. As explained in the legislative history of the ACPA, "the presence or absence of any of these [nine] factors may not be determinative." Sen. Rep. No. 106–140, at 9 (1999). Even so, "these factors reflect indicators that, in practice, commonly suggest bad-faith intent or a lack thereof in cybersquatting cases." *Id.* Thus, guided by the nine bad faith factors, "[c]ourts must ultimately weigh the facts of each case and make a determination based on those facts whether or not the defendant registered, trafficked in, or used the domain name with a bad-faith intent to profit from the goodwill of the mark of another." *Id.* at 10.

### 1.

■ Factor (I): "the trademark or other intellectual property rights of [the defendant], if any, in the domain name." 15 U.S.C. § 1125(d)(1)(B)(i)(I). The district court found that this factor favored the Domain Names because while Harrods BA does not own any United States trademarks, it does own trademarks for the name "Harrods" (and various permutations thereof, such as "Harrods Magazine") throughout South America. We agree. The language of Factor (I) does not speak in terms of United States trademark rights, but refers generally to "intellectual property rights." This encompasses intellectual property rights irrespective of their territorial origin.[10] Thus, Factor (I) favors the Domain Names.

### 2.

Factor (II): "the extent to which the domain name consists of the legal name of the person or a name that is otherwise commonly used to identify that person." 15 U.S.C. § 1125(d)(1)(B)(i)(II). The district court found that this factor also favored the Domain Names because Harrods BA is commonly known throughout Argen-

---

9. A more difficult problem, one not presented in this case, is created when a concurrent mark user registers a domain name incorporating the shared mark with the intent only to use the domain name within its limited geographic area, but the registrant's site is nonetheless accessed by users outside the permissible geographic area. If the registrant in this situation is deemed to violate the other user's trademark, then it is unclear how (territorial) concurrent users of a mark can maintain an Internet presence using their mark. This is one of the difficulties that courts and legislatures will eventually have to face as they work to harmonize the geographically limited nature of trademark law with the global nature of the Internet as a medium. *See generally*

Graeme B. Dinwoodie, *(National) Trademark Laws and the (Non–National) Domain Name System*, 21 U. Pa. J. Int'l Econ. L. 495 (2000).

10. Harrods UK raises the specter of cybersquatters registering trademarks identical to American marks in obscure locales—registering the name Nike in Burma, for example—and then using those foreign trademark rights as a shield against legal action by the American trademark holder. This case, however, does not involve a newly minted foreign trademark registered solely with the aim to defend against cybersquatting claims. That is a problem for another day.

tina and South America as "Harrods." We agree that Factor (II) favors the Domain Names.

### 3.

Factor (III): "the person's prior use, if any, of the domain name in connection with the bona fide offering of any goods or services." 15 U.S.C. § 1125(d)(1)(B)(i)(III). The district court found that this factor favored Harrods UK, correctly noting that Harrods BA has never offered goods or services online through these domain names. Instead, the sites accessible at these domain names simply displayed a picture of Harrods BA's department store in Buenos Aires and a form for requesting information. We agree that Factor (III), by its terms, favors Harrods UK. However, in this case Factor (III) does not sufficiently take into account the legitimacy of Harrods BA's use of Harrods-related names. As noted above, the nine factors from subsection (d)(1)(B)(i) are not exclusive, so we may consider other factors that are relevant given the particular facts of this case. *See Virtual Works*, 238 F.3d at 268.

In this case, Harrods BA has a long history of providing goods and services under the "Harrods" mark, so it is not surprising that it would want to register Harrods-related domain names to provide such goods and services online. Whenever a decades-old company seeks to launch an online retail store, there will likely be a startup period after domain name registration during which the company does not use the domain name to offer goods and services online. During this time, the company will not be able to show any "prior use ... of the domain name in connection with the bona fide offering of any goods or services," and thus it will not get the benefit of Factor (III). Here, for example, Harrods UK registered "har-

rods.com" in early 1999, but by October of that year it still had not offered goods or services through that domain name. In the circumstance where a domain name registrant has a longstanding history of using a trademark to provide goods and services (as Harrods BA has here), legitimate plans to offer such goods and services online in the future should be considered as a factor that mitigates against a finding of bad faith. Congress did not list the proposed future use of a domain name as a factor, presumably because it would be too easy for cybersquatters to claim an intent to use a disputed name to provide goods or services in the future. Indeed, the use of another's trademark as a domain name to sell goods or services is precisely one of the evils that the ACPA is aimed at combating. Sen. Rep. No. 106–140, at 6–7. But because Harrods BA's registration of the domain names is backed up with longstanding use of the "Harrods" mark, Harrods BA's failure to offer goods and services previously through those domain names should not be considered an indication of bad faith. *See, e.g.*, 145 Cong. Rec. S14,714 (daily ed. Nov. 17, 1999) ("[T]here are cases in which a person registers a name in anticipation of a business venture that simply never pans out."). Thus, Factor (III) does not reliably indicate bad faith on the part of Harrods BA. Instead, Harrods BA's long history of using the "Harrods" name to offer goods and services is a factor that favors the Domain Names.

### 4.

Factor (IV): "the person's bona fide noncommercial or fair use of the mark in a site accessible under the domain name." 15 U.S.C. § 1125(d)(1)(B)(i)(IV). As the district court noted, Harrods BA registered these Domain Names for a commer-

cial purpose, so this factor is not relevant here.

### 5.

Factor (V): "the person's intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site." 15 U.S.C. § 1125(d)(1)(B)(i)(V). The district court found that this factor weighed very heavily in favor of Harrods UK. According to the court, the evidence established that Harrods BA's online business plan was to use these Domain Names to profit by deliberately confusing and diverting non-South American customers seeking to shop at Harrods UK. First, the district court noted that Harrods BA had registered almost 300 Harrods-related domain names (most of which are not defendants here) covering a wide variety of good and services offered by Harrods UK but not by Harrods BA, such as: harrodsinsurance, harrodstravel, hotelharrods, harrodscasino, harrodstelephone, harrodsairplanes, harrodswines, harrodscamping, and harrodsrealestate.[11] While the registration of multiple Domain Names is a separate factor (Factor (VIII)) and will be considered below, it is relevant to Factor (V) that a great number of the names described goods and services offered by Harrods UK but not by Harrods BA. This fact

supports the district court's conclusion that the "Domain Names closely and deliberately replicate goods and services offered by [Harrods UK] or its affiliates." We agree that this indicates a bad faith intent to profit by diverting Harrods UK customers.

Second, the district court found it "highly suspect" that Harrods BA's domain name registrations almost always used English words rather than Spanish words, noting that Harrods BA was not authorized to conduct business outside of South America. However, the use of English language terms in domain names by non-English speakers, standing alone, does not constitute much evidence of an intent to market to American or British consumers. English is by far the most common language of the Internet. *See* Sharon K. Hom & Eric K. Yamamoto, *Collective Memory, History, and Social Justice*, 47 U.C.L.A. L.Rev. 1747, 1750 (2000) (noting that "[a]lthough only 10 percent of people worldwide speak English, 80 percent of internet websites appear in English."). And of course Spanish is not the national language in every South American country.[12] Nonetheless, in this case Harrods BA registered domain names containing large numbers of English words but *not* their Spanish counterparts, and those English words describe many of the goods and services offered by Harrods UK but not by Harrods BA. These facts, taken together, do offer support for the district court's finding that Harrods BA was in-

---

**11.** Some of these goods and services were never offered by Harrods BA, and others have *not been offered by Harrods BA for many years*.

**12.** Moreover, English words, particularly Internet-related terms, have rapidly entered foreign vocabularies. *See* Andrew Downie, *"War" Doesn't Mix Words: Congressman Works to Protect Native Language*, Sun–Senti-

nel (Ft.Lauderdale), September 21, 2000, at 16A (noting that English "words like 'e-mail,' 'mouse' and 'delete' have entered Portugese almost overnight"); *A Firm Handshake Seals the Deal in the Czech Republic*, Nat'l Post, January 9, 2001, at C09 ("Terms like 'IPO,' 'mobile telephone,' and 'start-up,' as well as 'Internet' and 'e-mail,' have already entered the [Czech] language.").

tending to target non-South American consumers.

Finally, the court discussed the incriminating business proposal prepared for Harrods BA by Capuro. As described above, this report contains an illustration of a proposed transaction over the Harrods BA website involving a "UK citizen" purchasing a Burberry sweater with funds from Barclays Bank. *See Harrods Ltd. v. Sixty Internet Domain Names,* 157 F.Supp.2d 658, 676 n. 51 (E.D.Va.2001) (reproduction of webpage illustration). We agree with the district court that this illustration transparently demonstrates an intent to profit from the Harrods-related domain names by confusing and diverting non-South American customers seeking to do business with Harrods UK. Harrods BA does not claim that it has any right to do business in Great Britain or that it has ever done business there. Thus, it cannot plausibly claim that British consumers would be aware of its identity as a separate entity from Harrods UK and not confuse the two. Finally, the "Harrods" logo on the proposed webpage is not the logo used by Harrods BA, but rather is identical to the script logo used for many years by Harrods UK. *Compare id.* at 675 n. 50 *with id.* at 661 n. 5 & 662 n. 6. The business opportunity represented by the Capuro report illustration is the opportunity to profit from Harrods UK's well-known "Harrods" trademark by improperly using that mark to sell to non-South American consumers who would think they were doing business with Harrods UK.

Harrods BA argues that we cannot rely on the Capuro report as an accurate gauge of its own intentions because the proposal was created by an outside consultant, not by Harrods BA executives themselves, and because the proposal was rejected by Harrods BA (apparently before the initiation of this lawsuit). Harrods BA also claims to have contacted Ernst & Young "in the first days of January" 2000 about preparing a new report. If we had only these facts, we would be hesitant to rely on the Capuro report as an indicator of Harrods BA's intent. Here, however, Harrods BA executives also testified that they used the report to solicit potential partners and investors, not only in Argentina but also in the United States and Europe. None of the solicited parties agreed to invest based on the Capuro report, and Harrods BA decided to seek a new business plan from another consultant. Nevertheless, the fact that Harrods BA shared the report with potential partners and investors demonstrates that the report, including the webpage illustration inside, fairly represents Harrods BA's own intentions. This fact suggests that Harrods BA did not ultimately reject the report because it proposed an improper use of the domain names, but rather because the report generated no interest from potential investors. All in all, it is fair to draw the inference that the report reflects Harrods BA's intent with regard to the domain names.

Because the Capuro report's scheme can be imputed to Harrods BA, the report constitutes very strong evidence that Harrods BA's intent was to use at least some of the domain names to sell to non-South American consumers who were seeking Harrods UK's website and who would think they were buying from Harrods UK. The report, combined with Harrods BA's registration of hundreds of Harrods-related domain names with terms closely mirroring products traditionally sold by Harrods UK but not by Harrods BA, is strong evidence of bad faith intent on the part of Harrods BA to divert non-South American consumers from Harrods UK's website to its own website. Because this evidence is so convincing, Factor (V) standing alone supports the district court's finding of bad faith intent on the part of Harrods BA.

6.

Factor (VI): "the person's offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain without having used, or having the intent to use, the domain name in the bona fide offering of any goods or services, or the person's prior conduct indicating a pattern of such conduct." 15 U.S.C. § 1125(d)(1)(B)(i)(VI). The district court found that this factor favored Harrods UK. The court noted that while there is no evidence that Harrods BA offered to sell or transfer the domain names to Harrods UK, "[t]he history of [Harrods BA's] efforts to sell its business supports plaintiff's argument that [Harrods BA's] registration of the Domain Names was intended to 'drive up the price [Harrods BA] can command from [Harrods UK] for the sale of [the "Harrods"] name.'" However, while Harrods BA clearly had some interest in selling out its South American trademarks and store to Harrods UK, this is neither inappropriate nor all that incriminating. Harrods BA has a legitimate right to use the Harrods name, albeit in a limited geographic area. The Congressional Record's section-by-section analysis of the ACPA states that Factor (VI) "does not suggest that a court should consider the mere offer to sell a domain name to a mark owner . . . as sufficient to indicate bad faith. . . . [S]omeone who has a legitimate registration of a domain name that mirrors someone else's domain name, such as a trademark owner that is a lawful concurrent user of that name with another trademark owner, may, in fact, wish to sell that name to the other trademark owner." 145 Cong. Rec. S14,-714 (daily ed. Nov. 17, 1999).

To the extent that Harrods BA had planned to use these Domain Names in a legitimate attempt to offer goods and services in South America (an assumption undermined by the evidence recounted in our discussion of Factor (V)), Harrods BA's registration of these names would be no more indicative of bad faith than its registration of a number of Harrods-related trademarks throughout South America, such as "Harrods Magazine," "Harrods Department Store," and "Harrodscard." There is nothing wrong with acquiring property, such as legitimate domain names or additional trademarks, for the express purpose of increasing the value (and therefore the potential sales price) of a business. Cybersquatting is considered wrong because a person can reap windfall profits by laying claim to a domain name that he has no legitimate interest in or relationship to. Sen. Rep. No. 106–140, at 5 ("Some [cybersquatters] register well-known brand names as Internet domain names in order to extract payment from the rightful owners of the marks."). It is not wrong, however, for a business to seek to profit from the sale of its legitimate assets.

Still, to the extent that Harrods BA intended to improperly divert non-South American Harrods UK customers, *see* Factor (V), and to the extent that the sale of the Domain Names would be based on the value to Harrods UK of preventing this practice, then Factor (VI) does demonstrate bad faith intent to profit and weighs in favor of Harrods UK. Because ample evidence supports the district court's determination under Factor (V) that Harrods BA intended to use the "Harrods" name to divert Harrods UK's customers, the evidence also supports the court's conclusion that Harrods BA intended to use these Domain Names to improperly leverage a higher price from Harrods UK. Factor (VI) therefore weighs in favor of Harrods UK.

7.

Factor (VII): "the person's provision of material and misleading false contact

information when applying for the registration of the domain name, the person's intentional failure to maintain accurate contact information, or the person's prior conduct indicating a pattern of such conduct." 15 U.S.C. § 1125(d)(1)(B)(i)(VII). The district court properly found this factor favored the Domain Names because Harrods BA never provided false or misleading contact information.

8.

Factor (VIII): "the person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others that are distinctive at the time of registration of such domain names, or dilutive of famous marks of others that are famous at the time of registration of such domain names, without regard to the goods or services of the parties." 15 U.S.C. § 1125(d)(1)(B)(i)(VIII). This factor was intended by Congress to target the "practice known as 'warehousing,' in which a cyberpirate registers multiple domain names—sometimes hundreds, even thousands—that mirror the trademarks of others." H.R.Rep. No. 106–412, at 13. *See also* Sen. Rep. No. 106–140, at 16. While the registration of multiple domain names is a factor that a court may consider in determining bad faith, Congress warned that the ACPA "does not suggest that the mere registration of multiple domain names is an indication of bad faith." H.R.Rep. No. 106–412, at 13. *See also* Sen. Rep. No. 106–140, at 16. This is presumably because many companies legitimately register many, even hundreds, of domain names consisting of various permutations of their own trademarks in combination with other words. "Just as they can have

several telephone numbers, companies can register multiple domain names in order to maximize the chances that customers will find their web site." *Porsche Cars North Am., Inc. v. Porsche.Com,* 51 F.Supp.2d 707, 709 (E.D.Va.1999), *vacated on other grounds,* 215 F.3d 1320 (4th Cir.2000) (unpublished per curiam).

Factor (VIII) nominally favors Harrods UK because Harrods BA did register multiple domain names that it knew were identical or confusingly similar to the mark of another, Harrods UK. We say "nominally favors" because Factor (VIII) will be triggered whenever there are concurrent users of a trademark. For example, Delta Airline's registration of delta.com constitutes the registration of a mark that it knows is identical to the mark of another, namely, Delta Faucets. But the legislative history of the ACPA shows that Congress recognized the legitimacy of concurrent uses of trademarks. *See* 145 Cong. Rec. S14,714 (daily ed. Nov. 17, 1999) (recognizing the rights of a lawful concurrent user of a name shared with another trademark owner). In the case of legitimate concurrent users, Factor (VIII) does not reliably indicate anything about the bad faith (or lack thereof) of the domain name registrant. Thus, standing alone, the fact that a company named Harrods of Buenos Aires with trademark rights in the name "Harrods" registers hundreds of Harrods-related domain names does not indicate bad faith.[13]

 Nonetheless, the district court found that this factor "heavily favored" Harrods UK. The court reasoned that because Harrods BA intended to use the names outside of South America and be-

---

**13.** As the district court noted, Harrods BA is not generally in the business of cybersquatting, that is, it has not registered hundreds of non-Harrods-related domain names, such as

names incorporating marks like "Bloomingdale's" or "Saks Fifth Avenue." The domain names it has registered only incorporate its own name.

cause it "[had] trademark rights only in South America, [Harrods BA's] registrations of these Domain Names in the United States amount to registrations of 'others' marks.'" We disagree with the suggestion that either the registrant's planned future use of a domain name or the physical location of the domain name registry influences whether that name incorporates "marks of others." Factor (VIII) simply asks a court to compare the domain name in question with the marks of the ACPA plaintiff.[14]

In sum, because Harrods BA is a concurrent user of the mark "Harrods," its registration of Harrods-related domain names nominally satisfies Factor (VIII) because Harrods BA registered multiple names identical or confusingly similar to the marks of others. This is true, however, for all concurrent users of marks who register domain names incorporating their marks. Factor (VIII) therefore cannot be weighed against the Domain Names in the bad faith calculus.

### 9.

Factor (IX): "the extent to which the mark incorporated in the person's domain name registration is or is not distinctive and famous within the meaning of subsection (c)(1) of this section." 15 U.S.C. § 1125(d)(1)(B)(i)(IX). As the district court noted, "Harrods" is both distinctive and famous as it relates to Harrods UK. Thus, this factor nominally favors Harrods UK. Like Factor (VIII), however, this fac-

tor is triggered in many instances involving concurrent users of a mark. Because Harrods BA also has trademark rights in "Harrods," this factor cannot be given much weight.

\* \* \*

As noted at the outset, this case presents us with the unusual situation of two companies named "Harrods," both with legitimate rights to use the "Harrods" name in different geographic regions. It is not surprising that concurrent users of a shared mark would resort to litigation under the recently enacted ACPA in an attempt to gain through the courts what they failed to obtain by speedy registration. In situations like these, many of the bad faith factors under the ACPA will have been triggered; for example, the first registrant may have offered to sell the disputed names to its competitor (Factor (VI)), and one or both of the companies may have registered many, perhaps even hundreds, of domain names incorporating the shared mark of the competitor (Factors (VIII) and (IX)). For two concurrent users of a mark, however, this sort of behavior is not cybersquatting; it is simply part of legitimate competition. The ACPA was not designed to provide a battlefield for legitimate concurrent trademark users. *See* 145 Cong. Rec. S14,713 ("[T]here may be concurring uses of the same name that are noninfringing ... [and that] would not tend to indicate a bad faith intent on the

---

**14.** Harrods UK places great weight on the fact that Harrods BA registered these domain names in the United States. This demonstrates, it argues, that Harrods BA intended to use the names to market to American consumers. We seriously doubt that the registration of a domain name in a registry located in the United States says *anything* about the intended audience for the registrant's website. In 1999, when these names were registered, NIS in Herndon, Virginia, was the exclusive

worldwide registry for .com, .net, and .org domain names. Thus, Harrods UK would have us believe that anyone, anywhere in the world, who registers a .com, .net, or .org domain name is presumptively trying to reach an American market. The evidence presented at trial does not come close to establishing this proposition, and a presumption to that effect is not supported by either the text or legislative history of the ACPA.

part of the registrant."). Nonetheless, while trademark law permits concurrent use of the same mark under certain conditions, a concurrent user of a mark may still violate the other user's trademark rights in certain cases. For example, if Delta Airlines wished to expand its business into the kitchen faucet market, it would have to do so under a name other than "Delta."

■ We have reviewed the facts of this case under the nine bad faith factors listed in § 1125(d)(1)(B)(i). Factor (IV) is not relevant because these names were registered for a commercial purpose. Factors (I), (II), and (VII) favor the Domain Names because Harrods BA is commonly known as Harrods in South America, has registered Harrods trademarks, and did not provide false contact information when registering these names. In addition, as noted in our discussion of Factor (III), Harrods BA's history of offering goods and services under the "Harrods" mark is another factor that favors the Domain Names. And given these circumstances, Harrods BA's failure to offer goods and services online through these domain names (Factor (III)) does not indicate bad faith on its part. Likewise, while Factors (VIII) and (IX), by their terms, suggest bad faith in this case, we have explained that given the facts, these factors are not entitled to much, if any, weight. Harrods BA did register multiple names incorporating a distinctive and famous mark of another (Factors (VIII) and (IX)), but this is true of all concurrent users who register domain names incorporating the shared

mark. Finally, Factors (V) and (VI) heavily favor Harrods UK. The evidence supports the district court's conclusion that Harrods BA registered these names with the intent to divert and confuse non-South American customers seeking to do business with Harrods UK, and that Harrods BA sought to extract a higher price for the sale of the Domain Names from Harrods UK as a result. Harrods BA may be presumptively entitled to register Harrods-related domain names because it is commonly known as Harrods and has trademark protection for that name. But these facts do not give Harrods BA an absolute right to use Harrods-related domain names. Here, the evidence demonstrates that Harrods BA registered the 54 Domain Names with the intent to use those names in a manner calculated to confuse and deceive non-South American consumers seeking to do business with Harrods UK. This crosses the line from a permissible intent to use Harrods BA's own South American "Harrods" trademark on the Internet to an impermissible intent to profit online from the protected mark of Harrods UK. Thus, the evidence as a whole supports the district court's finding of a bad faith intent to profit from the goodwill of Harrods UK's mark on the part of Harrods BA with regard to the 54 Domain Names that went to trial. Accordingly, we affirm the judgment of the district court as to the 54 Domain Names.[15]

## B.

Finally, we turn to consider the district court's grant of summary judgment to the

---

**15.** The Domain Names seek refuge in the safe harbor provision of the ACPA, which provides that "[b]ad faith intent . . . shall not be found in any case in which . . . the person believed and had reasonable grounds to believe that the use of the domain name was a fair use or otherwise lawful." 15 U.S.C. § 1125(d)(1)(B)(ii). This provision might be significant in some cases, such as when the site of a registrant with pure intent is accessed by a user beyond the registrant's geographically permissible area. See *supra*, footnote 9. But when the evidence demonstrates an express intent to use a shared mark in another's territory, as here, the registrant cannot claim a reasonable ground to believe that the intended use of the domain name was lawful.

six Argentina Names.[16] We have just affirmed the district court's determination after trial that Harrods BA registered the 54 Domain Names with a bad faith intent to profit, so it might seem that we must necessarily reverse the court's earlier grant of summary judgment to the Argentina Names on the bad faith claim. Ultimately, we do reverse the district court's grant of summary judgment to the six Argentina Names and remand for further proceedings. This decision, however, does not follow as a matter of course from our affirmance of the bad faith finding at trial. Instead, as explained below, the district court's grant of summary judgment must be examined independently of the evidence presented at trial.

In September of 2000 the six Argentina Names filed a separate motion for summary judgment. The Argentina Names argued that at least with respect to these six names, no reasonable factfinder could find bad faith on the part of Harrods BA. Harrods UK responded that even if, for example, Harrods BA had some sort of presumptive right to register and use harrodsbuenosaires, it could not intentionally use that name to try to deceive non-South American customers searching for Harrods UK. The Argentina Names pointed out that Harrods BA has intellectual property rights in the name "Harrods" in Argentina and that harrodsbuenosaires simply reflected the legal name of Harrods BA. On October 6, 2000, the district court awarded summary judgment to the six Argentina Names, even though discovery was just beginning. On appeal, as it did in its opposition to the Argentina Names' motion for summary judgment, Harrods UK argues on the one hand that the evidence before the district court created a genuine issue of material fact, precluding summary judgment, and on the other hand that further discovery was needed in order to unearth more evidence that would demonstrate a genuine issue of material fact. We consider these arguments in turn.

1.

In reviewing a district court's grant of summary judgment, we consider only those matters that were before the district court when it entered the judgment. "Our review is confined to an examination of the materials before the court at the time the rulings were made. Neither the evidence offered subsequently at the trial nor the verdict is relevant." *Voutour v. Vitale,* 761 F.2d 812, 817 (1st Cir.1985), *cert. denied,* 474 U.S. 1100, 106 S.Ct. 879, 88 L.Ed.2d 916 (1986). *See also Lippi v. City Bank,* 955 F.2d 599, 604 (9th Cir.1992); *Nissho–Iwai Am. Corp. v. Kline,* 845 F.2d 1300, 1307 (5th Cir.1988); 10A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice & Procedure* § 2716, at 282 (3d ed.1998). That is to say, we do not consider later-discovered evidence of bad faith intent, such as, for example, the Capuro business report, to determine whether a genuine issue of material fact existed at the time the district court granted summary judgment. Harrods UK presented the following evidence of bad faith to the district court in its opposition to the Domain Names' motion for summary judgment: Harrods BA had no right to use the "Harrods" name in the United States, had registered multiple Harrods-related domain names, had registered them in the United States, and had indicated in press releases that its use of the Harrods-related names would preclude Harrods UK from using these names. On

16. Again, the Argentina Names are harrodsbuenosaires.com, harrodsbuenosaires.net, harrodsbuenosaires.org, harrodsargentina.com, harrodsargentina.net, and harrodsargentina.org.

the basis of this evidence, we conclude that no reasonable factfinder could have found bad faith intent on the part of Harrods BA.

As explained in part III.A, Harrods BA's use of a United States-based domain name registry is not, standing alone, indicative of an intent on the part of Harrods BA to market to U.S. consumers. Likewise, as also explained in part III.A, the registration of multiple Harrods-related domain names by a company long known by the name Harrods (Buenos Aires) Limited is not indicative of bad faith. Harrods UK relies heavily on a news article from the Reuters news service as evidence of bad faith intent. In the article, a Harrods BA manager states that Harrods BA had registered more than 100 Harrods-related domain names "which the British Harrods will now be unable to use." Harrods UK claims that this statement indicates that Harrods BA's purpose in registering these domain names was to prevent Harrods UK from registering them. According to Harrods UK, this purpose indicates bad faith. Harrods UK relies on *Sporty's Farm L.L.C. v. Sportsman's Market, Inc.*, 202 F.3d 489, 499 (2d Cir.2000), a case where the court found bad faith based on, among other things, the fact that the defendant "registered sportys.com for the primary purpose of keeping [the plaintiff] from using that domain name." The court in *Sporty's Farm*, however, noted that the case involved "unique circumstances ... which do not fit neatly into the specific factors enumerated by Congress." *Id.* The defendant had created a corporation named "Sporty's Farm" only after it had registered sportys.com for the purpose of depriving the company it wished to compete with, Sportman's Market, of use of

the name. Here, both Harrods BA and Harrods UK had used the "Harrods" mark for decades. The fact that the two would race to register Harrodsrelated domain names is not surprising, nor does it indicate bad faith.[17] Moreover, the Reuters article goes on to report that Harrods BA "is only able to use the Harrods logo for delivery within South America." Thus, when the Argentina Names moved for summary judgment, Harrods UK had simply presented evidence that a company named Harrods (Buenos Aires) Limited with trademark rights in the name "Harrods" throughout much of South America had registered a number of Harrods-related domain names in the United States, had said that Harrods UK would be unable to use those names, and had announced its intent to use those names to sell goods and services in South America. Based on this evidence, no reasonable factfinder could determine that Harrods BA had registered harrodsbuenosaires and harrodsargentina in bad faith. This evidence failed to create a genuine issue of material fact on the question of bad faith intent sufficient to withstand summary judgment for the six Argentina Names.

### 2.

The remaining question is whether the district court granted summary judgment to the Argentina Names prematurely, before Harrods UK had an adequate opportunity through discovery to find evidence in the sole possession of Harrods BA that might indicate bad faith. One item not discovered at the time of summary judgment is the Capuro report, which we have relied on heavily in part III.A to affirm the district court's conclusion that the 54 Domain Names were reg-

---

**17.** Indeed, Harrods UK won the most critical leg of the race, registering the most desirable Harrods-related domain name, "har-

rods.com," before Harrods BA registered any names.

istered with the bad faith intent to divert Harrods UK customers. As explained above, we do not consider items not before the district court, such as the Capuro report, in reviewing the court's grant of summary judgment. Still, we must consider whether the district court granted summary judgment before Harrods UK had an adequate opportunity to discover potentially incriminating evidence such as the Capuro report.

 We review for abuse of discretion the district court's refusal to allow Harrods UK the opportunity to engage in discovery prior to the entry of summary judgment. *Mid Atlantic Telecom, Inc. v. Long Distance Servs., Inc.*, 18 F.3d 260, 262 (4th Cir.1994). Generally speaking, "summary judgment [must] be refused where the nonmoving party has not had the opportunity to discover information that is essential to his opposition." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 n. 5, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). At the same time, the party opposing summary judgment "cannot complain that summary judgment was granted without discovery unless that party had made an attempt to oppose the motion on the grounds that more time was needed for discovery." *Evans v. Technologies Applications & Service Co.*, 80 F.3d 954, 961 (4th Cir.1996). If a party believes that more discovery is necessary for it to demonstrate a genuine issue of material fact, the proper course is to file a Rule 56(f) affidavit stating "that it could not properly oppose a motion for summary judgment without a chance to conduct discovery." *Id.* In this case, although Harrods UK did advise the district court that it needed discovery, it did not file a Rule 56(f) affidavit. Thus, we must reconcile the "general rule [that] summary judgment is appropriate only after 'adequate time for discovery,'" *id.* (quoting *Celotex Corp. v. Ca-*

*trett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)), with Rule 56(f), which requires a party opposing summary judgment on the grounds that more discovery is needed to file an affidavit making that point. We have warned litigants that we "place great weight on the Rule 56(f) affidavit" and that "'[a] reference to Rule 56(f) and the need for additional discovery in a memorandum of law in opposition to a motion for summary judgment is not an adequate substitute for a Rule 56(f) affidavit.'" *Evans*, 80 F.3d at 961 (*quoting Paddington Partners v. Bouchard*, 34 F.3d 1132, 1137 (2d Cir.1994)). Indeed, "'the failure to file an affidavit under Rule 56(f) is itself sufficient grounds to reject a claim that the opportunity for discovery was inadequate.'" *Id.* Nevertheless, in some cases courts have held that summary judgment was premature even when the opposing party failed to file a Rule 56(f) affidavit. *See, e.g., Hellstrom v. U.S. Dep't of Veterans Affairs*, 201 F.3d 94 (2d Cir. 2000); *Farmer v. Brennan*, 81 F.3d 1444, 1449–50 (7th Cir.1996); *Dean v. Barber*, 951 F.2d 1210, 1214 n. 3 (11th Cir.1992); *First Chicago Int'l v. United Exchange Co.*, 836 F.2d 1375, 1380–81 (D.C.Cir.1988). "The purpose of the affidavit is to ensure that the nonmoving party is invoking the protections of Rule 56(f) in good faith and to afford the trial court the showing necessary to assess the merit of a party's opposition." *First Chicago*, 836 F.2d at 1380. When the nonmoving party, through no fault of its own, has had little or no opportunity to conduct discovery, and when fact-intensive issues, such as intent, are involved, courts have not always insisted on a Rule 56(f) affidavit if the nonmoving party has adequately informed the district court that the motion is pre-mature and that more discovery is necessary. *See id.* at 1380–81; *Hellstrom*, 201 F.3d at 97–98; *Farmer*, 81 F.3d at 1449–50; *Dean*, 951 F.2d at 1214 n. 3. Specifically, if the non-

moving party's objections before the district court "served as the functional equivalent of an affidavit," *First Chicago*, 836 F.2d at 1380, and if the nonmoving party was not lax in pursuing discovery, then we may consider whether the district court granted summary judgment prematurely, even though the nonmovant did not record its concerns in the form of a Rule 56(f) affidavit.[18]

At the time the district court granted summary judgment to the six Argentina Names, the court noted that "there's been almost no discovery conducted in this case" and that "summary judgment isn't usually granted or even considered this early in the proceedings . . . ." Moreover, in its order after trial awarding judgment to Harrods UK against the 54 Names, the district court added that "the facts revealed at trial have changed our view as to even [the] six [Argentina] Domain Names." Thus, the district court itself later expressed doubt that its summary judgment ruling as to the six Names was made with all of the material facts on the table. Harrods UK's amended complaint was filed on August 23, 2000, and the Argentina Names moved for summary judgment just 15 days later, on September 7, 2000. The district court granted summary judgment to the Argentina Names at the motion hearing on October 6, 2000, just over six weeks after the amended complaint was filed. According to the initial scheduling order, entered September 11, 2000, discovery was to be completed by December 29, 2000. The docket sheet indicates that the Domain Names did not respond to Harrods UK's first set of interrogatories until November 2, 2000, and we can find no evidence of depositions before December of 2000. Thus, summary judgment was granted to the Argentina Names when little or no discovery had been completed, and there is nothing to suggest that this was due to inactivity or delay on the part of Harrods UK.

Moreover, Harrods UK adequately fulfilled the purpose of Rule 56(f) by putting the district court on notice of the reasons why summary judgment was premature. In its memorandum opposing Harrods BA's motion for summary judgment, Harrods UK argued that "[f]urther evidence of bad faith is uniquely in the possession of defendants, and Harrods [UK] will need to seek and obtain discovery, which is only beginning, before it can present further evidence on bad faith and other issues. *See, e.g.*, Fed.R.Civ.P. 56(f)." One of the headings in Harrods UK's memorandum in opposition stated that Harrods BA's "bad faith is a material issue of fact that precludes entry of summary judgment *absent further discovery*." (emphasis added). Several times during the hearing on Harrods BA's motion for summary judgment, Harrods UK repeated its concern about the need for more discovery. At one point, Harrods UK stated, "The question is still: Would those marks . . . tend to confuse the consumer, the consumer in the United States? . . . [W]e're entitled to develop factual evidence that, yes, they do

---

18. This approach is also supported by commentary. *See, e.g.*, Edward Brunet, *The Timing of Summary Judgment*, 198 F.R.D. 679, 689–95 (2001) (reviewing cases applying Rule 56(f) liberally and concluding that "[t]hese cases exhibit sound reasoning"); John F. Lapham, Note, *Summary Judgment Before the Completion of Discovery: A Proposed Revision of Federal Rule of Civil Procedure 56(f)*, 24 U. Mich. J.L. Ref. 253, 269 (1990) ("Courts that

allow some deviation from the strict letter of rule 56(f) have the stronger argument. The intent of the drafters to infuse the Federal Rules with a spirit of procedural liberality is evident throughout the rules themselves as well as the advisory committee's notes."); 10B Charles A. Wright, Arthur R. Miller, & Mary Kay Kane, *Federal Practice & Procedure* § 2740, at 402–406 & n. 14 (3d ed.1998).

have a tendency to confuse." Later, the district court asked Harrods UK, "[I]s there any evidence in this record [that] they've asked your client to pay them a fee in exchange for those names?" Harrods UK responded that there had been negotiations, "but another part of that factor is whether they've offered to sell the name to somebody else. And we would want discovery on that."

In *First Chicago* the court concluded that "the combination of [the nonmovant's] opposition to dismissal on the merits, the accompanying Statement of Material Issues, and the outstanding discovery requests served as an adequate substitute for a Rule 56(f) affidavit." *First Chicago*, 836 F.2d at 1380–81. As we have indicated, Harrods UK, both in its opposition papers and at the motion hearing, informed the district court that more discovery was needed. It is not clear from this record whether Harrods UK had outstanding discovery requests pending when summary judgment was granted, as was the case in *First Chicago*. But if it did not, the only reason is that summary judgment was granted so early in the proceedings: the district court granted the Argentina Names' motion for summary judgment with over eleven of the fifteen weeks of scheduled discovery still remaining. Moreover, the district court clearly understood that Harrods UK would be pursuing discovery in the coming weeks and months. The court thus opened the summary judgment hearing by noting that "there's been almost no discovery conducted in this case," to which the Domain Names' lawyer responded, "It's beginning. It's in process." Even though it recognized that discovery was just getting under way, the district court decided to grant summary judgment to the six Argentina Names because it concluded that no discovery was needed to resolve the case as to those Names. The court did not use Harrods UK's failure to submit a Rule 56(f) affidavit as a basis for granting early summary judgment to the six Names.

In sum, the district court granted summary judgment to the six Argentina Names soon after the complaint was filed (about six weeks) and prior to almost any discovery, and Harrods UK was not dilatory in pursuing discovery. Moreover, Harrods UK made it clear to the district court in the summary judgment proceedings that its case hinged on its ability to establish Harrods BA's bad faith, which is a fact-specific issue. Harrods UK repeatedly explained to the district court both in writing and orally that more discovery was needed and that it was too early to decide the motion for summary judgment. The district court was thus fully informed about why Harrods UK was requesting the normal time to conduct discovery, and the absence of a Rule 56(f) affidavit did not figure in the court's decision to grant early summary judgment to the six Argentina Names. In these circumstances, the purposes of Rule 56(f) were served. As a result, it would be unfair to penalize Harrods UK for failing to file the formal affidavit called for by the rule.[19]

We now consider whether the district court granted summary judgment to the six Argentina Names before Harrods UK had adequate time to pursue discovery. Generally speaking, "[s]ufficient time for

---

**19.** Although the particular circumstances of this case mean that Harrods UK will not be penalized for failing to state its case for more discovery in an affidavit, we hasten to add that parties who ignore Rule 56(f)'s affidavit requirement do so at their peril. We reiterate that our court expects full compliance with Rule 56(f) and that the "failure to file an affidavit under Rule 56(f) is itself sufficient grounds to reject a claim that the opportunity for discovery was inadequate." *Evans*, 80 F.3d at 961 (quotations omitted).

discovery is considered especially important when the relevant facts are exclusively in the control of the opposing party." 10B Charles A. Wright, Arthur R. Miller, & Mary Kay Kane, *Federal Practice & Procedure* § 2741, at 419 (3d ed.1998). And summary judgment prior to discovery can be particularly inappropriate when a case involves complex factual questions about intent and motive. *See Illinois State Employees Union v. Lewis*, 473 F.2d 561, 565–66 (7th Cir.1972) (motive); *Int'l Raw Materials, Ltd. v. Stauffer Chem. Co.*, 898 F.2d 946, 949–50 (3d Cir.1990) (complex questions). Both of these circumstances were present in this case. First, relevant facts about Harrods BA's intent were in the exclusive possession of Harrods BA. Second, the issue of Harrods BA's intent—whether it registered the Argentina Names in bad faith—was a complex one that required development of the facts bearing on the nine factors listed in § 1125(d)(1)(B)(i). For example, as Harrods UK made clear in the summary judgment proceedings, further discovery was necessary to shed light on Harrods BA's motive in registering the Argentina Names. *See* 15 U.S.C. § 1125(d)(1)(B)(i)(V). We therefore conclude that the district court's grant of summary judgment to the six Argentina Names was premature, and we reverse the summary judgment and remand for further proceedings, including any other discovery that is necessary.

We noted above that the district court itself later questioned its decision to grant summary judgment to the six Argentina Names. Indeed, the district court went so far as to say that if we were to reverse the summary judgment and remand, the court "would enter judgment against the six domain names ... for the reasons stated in th[e] Memorandum Opinion [ruling against the 54 Domain Names]." We believe, however, that it is still an open question whether the six Argentina Names warrant the same treatment as the 54 Names. As the district court noted when it granted summary judgment to the Argentina Names, there are important differences between the two sets of names. For example, the district court explained that "anyone looking at [the six Argentina Names] is going to understand that they are linked with South America." This observation may have bearing on, among other things, whether the Argentina Names are "identical or confusingly similar" to Harrods UK's mark. In making these observations, we do not prejudge the case. We are simply emphasizing how important it is for the district court on remand to take a fresh look at the Argentina Names in light of the provisions of the ACPA and whatever evidence may be relevant to those Names.

## IV.

To sum up, we hold that 15 U.S.C. § 1125(d)(2) authorizes an in rem action against domain names based on claims of infringement and dilution as well as bad faith registration. Accordingly, we reverse the district court's dismissal of the infringement and dilution claims and remand for further proceedings. (As noted above, because we affirm the judgment as to the 54 Names, the district court on remand need only consider Harrods UK's infringement and dilution claims with respect to the six Argentina Names.) We also hold that the district court did not err in concluding that Harrods BA registered the 54 Domain Names in bad faith, specifically, that Harrods BA registered the 54 Names with the intent to use those names to sell goods and services to non-South American consumers seeking to do business with Harrods UK. Accordingly, we affirm the district court's judgment and order requiring the transfer of the 54

Names to Harrods UK. Finally, we hold that the district court's grant of summary judgment to the six Argentina Names was premature, so we reverse the summary judgment and remand for further proceedings.

*AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.*