**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

—————

**No. 07-2140**

—————

IGOR BELYAKOV,

        Plaintiff – Appellant,

    v.

MICHAEL O. LEAVITT, Secretary,

        Defendant – Appellee.

—————

**No. 07-2141**

—————

IGOR BELYAKOV,

        Plaintiff – Appellant,

    v.

MICHAEL O. LEAVITT, Secretary, United States Department of
Health and Human Services,

        Defendant – Appellee.

—————

Appeal from the United States District Court for the District of
Maryland, at Greenbelt. Deborah K. Chasanow, District Judge.
(8:04-cv-04008-DKC)

—————

Argued: October 29, 2008      Decided: January 21, 2009

—————

Before WILLIAMS, Chief Judge, MICHAEL, Circuit Judge, and John T. COPENHAVER, Jr., United States District Judge for the Southern District of West Virginia, sitting by designation.

———————————

Affirmed by unpublished per curiam opinion.

———————————

**ARGUED:** Bart Garry, Baltimore, Maryland, for Appellant. Jason Daniel Medinger, OFFICE OF THE UNITED STATES ATTORNEY, Baltimore, Maryland, for Appellee. **ON BRIEF:** Rod J. Rosenstein, United States Attorney, Baltimore, Maryland, for Appellee.

———————————

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Dr. Igor Belyakov filed two actions against his former employer, the Secretary of the U.S. Department of Health and Human Services (DHHS), under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. In the first action he alleged that he was not selected for a new position in DHHS because of his (Russian) national origin. In the second action he alleged that he was retaliated against (not retained in his existing position) because he had filed an administrative claim alleging national origin discrimination. The district court entered summary judgment for DHHS in both cases, which have been consolidated on appeal. We affirm.

I.

Because these cases are before us on appeal from the grant of summary judgment, we state the facts in the light most favorable to the non-moving party, Belyakov. See Holland v. Wash. Homes, Inc., 487 F.3d 208, 210 (4th Cir. 2007). Belyakov began working in December of 1996 as a senior postdoctoral fellow at the National Cancer Institute (NCI), a division of the National Institutes of Health (NIH), which in turn is a part of DHHS. Specifically, he worked in the Vaccine Branch, Center for Cancer Research under Branch Chief Dr. Jay Berzofsky. Belyakov was promoted to a Staff Scientist position in November 2001. This appointment was for a five-year term that was potentially

3

renewable for a second five-year term.  In 2002 two tenure track positions became available in the National Institute of Dental and Craniofacial Research (NIDCR), a separate division within NIH.  Both positions were in the Oral Infection and Immunity Branch headed by Branch Chief Dr. Sharon Wahl.  The openings were for a mucosal immunologist and a molecular immunologist. Belyakov applied for both positions.

NIH guidelines outline the standard procedures used to fill tenure track positions within the institutes and centers that form NIH.  The guidelines contemplate the formation of a search committee that includes among its membership a chairperson who is an expert in the scientific field, a woman scientist advisor, a scientist who identifies him- or herself as an under-represented minority, a representative of the Office of Equal Opportunity and Diversity Management, and a representative nominated by NIH's Deputy Director of Intramural Research. Additionally, the guidelines contemplate that the Chief of the Lab or Branch with the open position will serve on the committee.  The search committee has several responsibilities, the most significant of which is as follows:

> The search committee members shall review all applications received that are judged at least minimally qualified.  Likely candidates are invited for presentation of a seminar and interviews as appropriate.  These are scheduled so that a majority of the scientists on the search committee can participate.  A short list (no more than 2 or 3) of

4

highly qualified candidates, [should be] prepared by the Committee Chair.

J.A. 732.

According to the guidelines, this short list of candidates is reviewed by the Lab or Branch Chief, who recommends a candidate to a Selecting Official. The guidelines contemplate that the Scientific Director of the relevant institute or center will serve as the Selecting Official unless he or she serves on the search committee. In that event, the guidelines indicate that the Director of the institute or center will serve as the Selecting Official. Finally, the Scientific Director must forward the name of the selected candidate, for review and approval, to the Director of the relevant institute or center and to the Deputy Director for Intramural Research. The guidelines specifically note that modifications to these procedures are appropriate in individual cases depending on the seniority and expertise level desired in the individual ultimately selected.

The search process used to fill the mucosal immunologist position in the Oral Infection and Immunity Branch was modified in one significant respect. The guidelines contemplated that Dr. Henning Birkedal-Hansen as Scientific Director of NIDCR would act as the Selecting Official unless he served on the search committee, in which case NIDCR's director,

5

Dr. Larry Tabak, would serve as the Selecting Official. In this case, however, Wahl, the Branch Chief, served as the Selecting Official. The record does not indicate why Wahl served as the Selecting Official, but it does establish that Wahl assumed that position at the start of the search process. The procedures used were otherwise largely unmodified from those suggested by the guidelines. Wahl initially drafted a list of search committee members that complied with the criteria specified in the guidelines. That list was approved by the Scientific Director, Birkedal-Hansen, and NIH's Deputy Director of Intramural Research, Dr. Michael Gottesman. Once formed, the search committee winnowed down the twelve applicants for the mucosal immunologist position to two candidates: Belyakov and Dr. Wanjun Chen.

Belyakov had also been selected as a top candidate for the molecular immunologist position. The search committee created for that position had, in fact, already scheduled Belyakov to present a seminar when the mucosal immunologist search committee informed Wahl that Belyakov was also one of its top candidates. On becoming aware that he was a top candidate for both positions, Wahl suggested to the committees that Belyakov give a single seminar attended by members of both search committees. The committees would then separately interview him.

Belyakov's dual purpose seminar took place March 18, 2003, as did his interviews with the molecular immunologist search committee and several other individuals. Early in the afternoon Belyakov met individually with Wahl and then Tabak. The record does not make clear which position Belyakov's interviews with Wahl and Tabak related to or whether the interviews related to both positions. Belyakov asserts that in his interview with Tabak, Tabak told him that "there were too many Russians at NIDCR already." J.A. 440. Thereafter, Belyakov presented his dual purpose seminar and answered questions. Following the seminar Belyakov met with the molecular immunologist search committee as a group, and then he met individually with senior investigators working in Wahl's laboratory. One of these senior investigators, Nick Ryba, was a member of the mucosal immunologist search committee, although there is no indication that he interviewed Belyakov in his capacity as a member of that search committee.

The molecular immunologist search committee recommended two candidates (Belyakov was not one of them) to Wahl, who in turn recommended one of those candidates to Birkedal-Hansen. NIDCR director Tabak ultimately decided not to fund a molecular immunologist position in Wahl's Branch.

The mucosal immunologist search committee proceeded by interviewing Dr. Wanjun Chen and attending his seminar

presentation. The search committee never met as a whole to interview Belyakov. Nevertheless, several members of the search committee attended Belyakov's seminar and one member of the committee, Ryba, individually interviewed Belyakov following the seminar. The search committee appears to have had at least one discussion after both candidates' seminars. In that discussion "no-one . . . stood up for [Belyakov] as the better candidate." J.A. 565. In a letter dated September 5, 2003, the Chair of the search committee wrote a letter to Wahl indicating that the committee considered Belyakov and Chen the top candidates for the mucosal immunologist position. The letter also said that, "of the two candidates, Dr. Wanjun Chen was judged to be the somewhat stronger candidate." J.A. 544.

On September 23, 2003, Wahl informed Belyakov that the search committee had recommended Chen for the mucosal immunologist position and that she and Birkedal-Hansen had concurred in this recommendation. Two days later Belyakov sent a letter to Gottesman complaining about inequities in the search process. Gottesman agreed to look into the matter, noting that Chen's appointment could not be finalized without his approval. His staff began contacting and interviewing members of the search committee to determine whether there were any irregularities. On October 10, 2003, Birkedal-Hansen formally concurred in the recommendation of Chen and sought approval from

8

both Tabak and Gottesman to appoint Chen to the position. By letter dated January 22, 2004, Gottesman informed Belyakov that he had completed his inquiry into the search process and had concluded that Belyakov had been provided a fair opportunity to compete for the position. Shortly thereafter, Gottesman formally approved Chen.

After contacting an Equal Employment Opportunity (EEO) counselor on February 23, 2004, Belyakov filed a complaint with the Equal Employment Opportunity Commission (EEOC) alleging that his non-selection for the mucosal immunologist position was due to national origin discrimination and age discrimination. The EEOC dismissed his complaint as untimely, but DHHS has since conceded that the complaint was timely filed. Belyakov filed a complaint in district court against DHHS on December 23, 2004. Belyakov's complaint alleged national origin discrimination under Title VII, 42 U.S.C. § 2000e-2, and a violation of the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 623. He later withdrew his age discrimination claim. DHHS filed a motion for summary judgment on March 14, 2007.

While pursuing his EEO action, Belyakov continued working in the Vaccine Branch of the Center for Cancer Research under Branch Chief Dr. Jay Berzofsky. Their relationship grew increasingly strained. Berzofsky claims that Belyakov

9

> became more and more confrontational and antagonistic not only with me, but with the other scientists in the Branch and some outside collaborators. Dr. Belyakov several times refused to follow my direct orders and would become overly insubordinate. . . . As time went on the problems with him started becoming more and more frequent, reaching a crescendo in May 2005 when I was forced to issue Dr. Belyakov an official reprimand in writing.

J.A. 259-60. Belyakov alleges that Berzofsky treated him inequitably by limiting his resources, access to equipment, authorship opportunities, and sick leave. During this time Berzofsky informally rebuked Belyakov at least once for ignoring his instructions. He wrote an email to Belyakov on April 20, 2005, indicating that he was "very concerned and displeased" to learn that Belyakov had contacted a publication to question why it had rejected his submission, even though Berzofsky had explicitly told Belyakov not to contact the publication. J.A. 283.

Berzofsky issued an official reprimand to Belyakov in May 2005. Although the reprimand referred to one incident in September 2002 in which Belyakov was allegedly "insubordinate in refusing to include data from a collaborator" in a study, J.A. 285, the bulk of the incidents referred to in the reprimand took place between February and May 2005. The reprimand asserts that Belyakov refused to make changes to jointly authored manuscripts that Berzofsky requested as the senior author; that Belyakov objected to scheduling changes in a manner that was disruptive

10

and that undermined Berzofsky's authority; and that Belyakov lost his temper over several decisions Berzofsky made with respect to Belyakov's collaborations with other scientists. In November 2005 Berzofsky informed Belyakov that his appointment would not be renewed when it expired the following year.

Belyakov filed a complaint with the EEOC on January 13, 2006, alleging that the decision not to renew his position in the Vaccine Branch was in retaliation for prior EEO activity and because of national origin discrimination. On April 4, 2006, Belyakov further submitted an affidavit to the EEOC in which he asserted that Berzofsky had treated him inequitably in various ways and had issued him an official reprimand. The affidavit suggests that at least some of Berzofsky's conduct was in retaliation for Belyakov's prior EEO activity and because of Belyakov's national origin. The EEOC issued a final decision denying Belyakov's claims on August 20, 2006. Belyakov filed a complaint against DHHS on November 11, 2006. He alleges illegal retaliation under Title VII, 42 U.S.C. § 2000e-3. Belyakov also filed a motion to commence discovery. DHHS filed a motion to dismiss or, in the alternative, for summary judgment on January 22, 2007.

On September 6, 2007, the district court granted DHHS summary judgment in both cases. The court also denied Belyakov's motion to commence discovery in the retaliation case.

11

Belyakov timely appealed those determinations, and the two cases have been consolidated.

## II.

We first address Belyakov's claim that his rights under Title VII were violated when he was not selected for the mucosal immunologist position in the Oral Infection and Immunity Branch of NIDCR because of national origin discrimination. We review de novo the district court's grant of summary judgment to DHHS on this issue. Hill v. Lockheed Martin Logistics Mgmt., Inc., 354 F.3d 277, 283 (4th Cir. 2004). "Summary judgment is appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" Id. at 283 (quoting Fed. R. Civ. P. 56(c)); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The court must construe the evidence in the record in the light most favorable to the nonmoving party and draw all reasonable inferences in his favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). But, there must be "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Id., at 249-50 (internal citations omitted).

12

Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Belyakov, who was born in Russia, argues that DHHS failed or refused to hire him in a new position because of his national origin. Belyakov may prove this alleged violation of Title VII in either of two ways: (1) by "using any direct or indirect evidence relevant to and sufficiently probative" of discriminatory purpose or (2) by using the burden-shifting approach outlined in McDonnell Douglas Corporation v. Green, 411 U.S. 792 (1973). Rhoads v. FDIC, 257 F.3d 373, 391-92 (4th Cir. 2001). Belyakov argued to the district court that there was sufficient direct evidence of discrimination to withstand summary judgment and, in the alternative, that he was able to succeed under the McDonnell Douglas burden-shifting approach. The district court rejected both arguments. On appeal Belyakov argues only that summary judgment was not appropriate in light of sufficient direct evidence of discrimination.

To overcome summary judgment by proving direct evidence of discriminatory purpose, Belyakov must point to "evidence of conduct or statements that both reflect directly

13

the alleged discriminatory attitude and that bear directly on the contested employment decision." Brinkley v. Harbour Recreation Club, 180 F.3d 598, 607 (4th Cir. 1999) (quoting Fuller v. Phipps, 67 F.3d 1137, 1142 (4th Cir. 1995)). Discriminatory purpose need not be the sole reason for the employment decision, but it must play a motivating role in the decision. 42 U.S.C. § 2000e-2(m); Baird v. Rose, 192 F.3d 462, 470 (4th Cir. 1999).

Belyakov argues that Dr. Tabak's statement that "there were too many Russians at NIDCR already" constitutes direct evidence of discrimination. When this statement is construed in the light most favorable to Belyakov, it reflects discriminatory animus. Discriminatory animus is not enough by itself, however; there must also be a showing that Tabak was responsible for the decision not to hire Belyakov. "[T]he plaintiff [must] present[] sufficient evidence to establish that [the person allegedly acting pursuant to a discriminatory animus] was the one 'principally responsible' for, or the 'actual decisionmaker' behind, the action." Hill v. Lockheed Martin Logistics Mgmt., Inc., 354 F.3d 277, 288-89 (4th Cir. 2004) (citing Reeves v. Sanderson, 530 U.S. 133, 151-52 (2000)). The district court concluded that the actual decisionmaker in this case was Deputy Director Gottesman whose approval was required in order to

14

finalize Chen's appointment to the mucosal immunologist position.

Belyakov agues that Gottesman may have been the actual decisionmaker with respect to the decision to hire Chen, but not with respect to the non-selection of Belyakov. Belyakov had already been eliminated from the search process by the time the decision reached Gottesman. Certainly, a search process that eliminates candidates because of discriminatory animus is not insulated under Title VII by virtue of the fact that non-discriminatory personnel decisions are later made with respect to remaining candidates. In this case, however, there is no evidence that Tabak, who was allegedly acting with discriminatory animus, was responsible for the decision not to select Belyakov. Tabak attended Belyakov's seminar and interviewed Belyakov the morning of the seminar. But a number of NIDCR scientists who were not part of the search process attended the seminar. Participation and questioning from the scientific community appears to have been expected and required so that the search committee members present had an opportunity to see Belyakov answer questions and interact with scientists in the pertinent field of research. Five senior scientists unaffiliated with the molecular immunologist search committee interviewed Belyakov that day. There is no suggestion that these scientists were involved in any search committee

15

decisions. Thus, the fact that someone participated as an interviewer does not prove that he or she also participated in search committee decisions.

Tabak was not on the search committee, and there is no evidence that Tabak influenced the committee in its decision not to select Belyakov. The search committee chair sent a recommendation letter to Wahl indicating that both Belyakov and Chen "were excellent young scientists with very considerable promise," but that, "of the two candidates, Dr. Wanjun Chen was judged to be a somewhat stronger candidate." J.A. 544-45. It made clear that the committee "considered Dr. Wanjun Chen as the top candidate." J.A. 545. Belyakov fails to establish that Tabak had any responsibility over the decision not to select him.

Belyakov notes that Tabak approved the decision of the search committee and recommendation of Wahl to select Chen. Tabak's approval simply meant that the ultimate decision was referred to Gottesman. Gottesman did not approve Chen's selection in a perfunctory way. Rather, he responded to Belyakov's concerns about the propriety of the search process by conducting an independent review. Gottesman's staff interviewed every member of the search committee to determine whether Belyakov had a fair opportunity to apply for the position and, if not, whether to re-open the process. The extent of this

16

inquiry suggests that Gottesman was truly the final decisionmaker, and there is no evidence that he bore discriminatory animus toward Russian-born applicants. For these reasons, the award of summary judgment to DHHS was appropriate on Belyakov's national origin discrimination claim.

III.

We next consider Belyakov's claims that Dr. Berzofsky took adverse employment actions against Belyakov in retaliation for Belyakov's prior EEO activity. Belyakov filed a complaint with the EEOC in January 2006 alleging that Berzofsky had declined to renew Belyakov's Staff Scientist position in retaliation for Belyakov's prior EEO activity. Belyakov later claimed, and asserts in his complaint filed in district court, that Berzofsky also retaliated in the following ways: he took away projects, took away resources, prevented training, eliminated funding for projects, eliminated authorship opportunities on projects, prevented job applications from proceeding, made false accusations of sabotage, and issued an official reprimand. Belyakov claims that these adverse actions were also taken in retaliation for his prior EEO activity. Belyakov never amended his EEO complaint to add these additional claims. He did, however, file an affidavit on April 7, 2006, which, he says, covers these additional claims. The district court dismissed the additional claims on the ground that

17

Belyakov failed to administratively exhaust them. The court then granted summary judgment to DHHS on the remaining claim that Belyakov's Staff Scientist position was not renewed due to retaliation. Belyakov appeals these rulings.

A.

"Before filing suit under Title VII, a plaintiff must exhaust h[is] administrative remedies by bringing a charge with the EEOC." Smith v. First Union Nat'l Bank, 202 F.3d 234, 247 (4th Cir. 2000). The administrative charge does not strictly delimit the claims a plaintiff may later make in federal court. "[R]ather, the scope of the civil action is confined only by the scope of the administrative investigation that can reasonably be expected to follow the charge of discrimination." Chisholm v. U.S. Postal Serv., 665 F.2d 482, 491 (4th Cir. 1981). Belyakov's formal complaint alleged that his Staff Scientist position was not renewed in reprisal for prior EEO activity. He argues that his other claims of retaliation -- that Berzofsky took away projects, resources, and training; eliminated authorship opportunities on projects; prevented job applications from proceeding; made false accusations of sabotage; and formally issued Belyakov an official reprimand -- were administratively exhausted because they fall within the scope of a reasonable administrative investigation.

We agree that administrative investigation of the official reprimand Berzofsky issued to Belyakov could reasonably be expected to occur in light of Belyakov's complaint. This reprimand was a prelude to the non-renewal of his appointment; Berzofsky issued it in anticipation of terminating or declining to renew Belyakov's appointment. Indeed, the EEOC's final decision letter discusses the official reprimand in detail. Belyakov thus exhausted the claim that the official reprimand he received was the result of retaliation.

The district court correctly dismissed the remaining claims of retaliation, however. The claims that Berzofsky took away projects, resources, training, funding, and authorship opportunities, hindered job applications, and made false accusations of sabotage are outside the scope of the major employment decisions that a reasonable administrative investigation would have covered in light of Belyakov's EEO complaint.

Belyakov also argues that the affidavit he submitted to the EEOC on April 7, 2006, was sufficient to administratively exhaust the claims he failed to raise in his original complaint. Belyakov argues that such an affidavit should shape the scope of a reasonable EEOC investigation. See Ihekwu v. City of Durham, 129 F. Supp. 2d 870, 886 (M.D.N.C. 2000). Even if we were to adopt this principle, the affidavit was not sufficient to

19

require an expansion of the scope of the administrative investigation to include Belyakov's additional claims. The ten-page affidavit describes a number of perceived inequities and specific disagreements between Belyakov and Berzofsky. A reasonable EEOC investigation here would not have included a reorientation of efforts to sift through Belyakov's numerous additional allegations against Berzofsky.

Moreover, the affidavit was filed four months after the original EEOC charge. By that time, the EEOC investigation was well under way. Affidavits had already been solicited and received from Berzofsky and Employee and Labor Relations Specialist Maria Gorrasi. Deputy Director of the Center for Cancer Research, Douglas Lowy, had also substantially completed an affidavit. Even assuming that a complainant's affidavit might affect the scope of a reasonable administrative investigation, an affidavit filed late in the process, after an administrative investigation has substantially advanced, cannot be expected to significantly expand its scope. We thus conclude that Belyakov failed to administratively exhaust all but two of his claims. While he did exhaust his claim that DHHS failed to renew his appointment and issued him an official reprimand in violation of Title VII, the remaining claims were properly dismissed on the ground that they were not administratively exhausted.

20

B.

We proceed to consider whether the claims that Belyakov did administratively exhaust were nevertheless properly rejected on summary judgment. Here, we use the burden-shifting framework suggested in McDonnell Douglas Corporation v. Green, 411 U.S. 792, 803-05 (1973), for evaluating claims of retaliation under Title VII. Under this framework the plaintiff must establish a prima facie case of discrimination. "If a prima facie case is presented, the burden shifts to the employer to articulate a legitimate nondiscriminatory reason for the adverse employment action." Hill v. Lockheed Martin Logistics Mgmt., Inc., 354 F.3d 277, 285 (4th Cir. 2004). If the employer meets this burden of production, "the burden shifts back to the plaintiff to prove by a preponderance of the evidence that the employer's stated reasons 'were not its true reasons, but were a pretext for discrimination.'" Id. at 285 (citing Reeves v. Sanderson Plumbing Prods., Inc., 330 U.S. 133, 143 (2000)).

To establish a prima facie case of retaliation, a plaintiff must show (1) that he engaged in protected activity; (2) that an adverse employment action was taken against him; and (3) that there was a causal link between the protected activity and the adverse employment action. Laughlin v. Metro. Wash. Airports Auth., 149 F.3d 253, 258 (4th Cir. 1998). Belyakov's prior EEO complaint constitutes protected activity. See Price

21

v. Thompson, 380 F.3d 209, 212 (4th Cir. 2004). Issuing an official reprimand and declining to renew Belyakov's appointment are adverse employment actions; both would dissuade "a reasonable worker from making or supporting a charge of discrimination." Lettieri v. Equant Inc., 478 F.3d 640, 650 n.2 (4th Cir. 2007) (quoting Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 57 (2006)). Finally, evidence that an employer acted only after becoming aware that an employee filed a discrimination charge is sufficient to establish the causal connection required under the third element of a prima facie case. Williams v. Cerberonics, Inc., 871 F.2d 452, 457 (4th Cir. 1989). Belyakov offers evidence suggesting that Berzofsky became aware of his EEO activity in or shortly prior to an August 6, 2004, meeting with scientists who had served on the mucosal immunologist search committee. Belyakov issued the official reprimand May 27, 2005, and it mostly refers to incidents that occurred on or after February 17, 2005. Belyakov was informed on November 7, 2005, that his appointment would not be renewed when it expired the following year. There is thus evidence that allows some loose inference of causality. "While this proof far from conclusively establishes the requisite casual connection, it certainly satisfies the less onerous burden of making a prima facie case of causality." Id. at 457.

22

When the plaintiff carries his burden of showing a prima facie case of retaliation, the burden shifts to the defendant to articulate a legitimate, non-retaliatory justification for the adverse employment action. See Reeves, 530 U.S. at 143. DHHS meets this burden. Berzofsky said that Belyakov became increasingly confrontational and insubordinate and that he ignored direct orders and criticized Berzofsky in private and in public. Even Belyakov acknowledges that he criticized Berzofsky and suggested that Berzofsky was unethical. Berzofsky's dissatisfaction with this confrontational behavior and how it affected relevant professional relationships is a legitimate, non-retaliatory reason for issuing an official reprimand to Belyakov and, later, declining to renew his appointment. DHHS thus satisfies its burden of production.

The burden shifts back to Belyakov to demonstrate that the non-retaliatory justifications offered by DHHS were not its true reasons, but pretext for retaliation. Id. at 143. We conclude that Belyakov fails to put forth sufficient evidence to show that the legitimate, non-retaliatory reasons proffered by Berzofsky were false. The evidence that Belyakov instigated arguments and disobeyed instructions as Berzofsky describes is unrebutted. And, nothing in the record suggests that Berzofsky did not believe that Belyakov was confrontational, insubordinate, and disruptive. See Holland v. Wash. Homes Inc.,

23

487 F.3d 208, 215 (4th Cir. 2007). In short, Belyakov fails to provide evidence that "the defendant's explanation is unworthy of credence." Reeves, 530 U.S. at 147. We therefore conclude that there is insufficient evidence of pretext to withstand summary judgment.

Belyakov also argues that summary judgment was not appropriate in the retaliation case because there was not adequate time for discovery. The district court declined to permit Belyakov the opportunity to engage in discovery prior to the entry of summary judgment. We review that determination for abuse of discretion. Harrods Ltd. v. Sixty Internet Domain Names, 302 F.3d 214, 244 (4th Cir. 2002). "Generally speaking, 'summary judgment [must] be refused where the nonmoving party has not had the opportunity to discover information that is essential to his opposition.'" Id. at 244 (quoting Anderson v. Liberty Lobby, Inc. 477 U.S. 242, 250 n.5 (1986)). The party opposing summary judgment must make clear, however, that discovery is essential to his opposition. Shafer v. Preston Mem'l Hosp. Corp., 107 F.3d 274, 282 (4th Cir. 1997).

> If a party believes that more discovery is necessary for it to demonstrate a genuine issue of material fact, the proper course is to file a Rule 56(f) affidavit stating "that it could not properly oppose a motion for summary judgment without a chance to conduct discovery." . . . Indeed, "the failure to file an affidavit under Rule 56(f) is itself sufficient grounds to reject a claim that the opportunity for discovery was inadequate."

24

*Harrods Ltd.*, 302 F.3d at 244 (quoting *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 961 (4th Cir. 1996). We have recognized that there may be circumstances when the opposing party fails to file a Rule 56(f) affidavit, and yet it is appropriate for a court to conclude that summary judgment is premature. Even in those circumstances, however, the nonmoving party must "adequately inform[] the district court that the motion is premature and that more discovery is necessary." *Harrods Ltd.*, 302 F.3d at 244.

Belyakov argues that an affidavit filed by his counsel is a Rule 56(f) affidavit and that the district court abused its discretion by failing to deny summary judgment in light of the affidavit. The affidavit Belyakov refers to seeks discovery on "the issues of a causal connection between the protected activity and adverse actions, as well as the issue of pretext." J.A. 427. While the district court did not mention the affidavit in its decision, the affidavit was in no event sufficient to put the district court on notice that summary judgment was premature. Nothing in the affidavit invokes Rule 56(f) or suggests that a summary judgment decision should have been deferred. In fact, the affidavit states that "Plaintiff has presented enough evidence to defeat summary judgment." J.A. 427. It simply discusses the need for additional discovery in order "to prove its case for trial." J.A. 427. Belyakov did

not adequately inform the district court that summary judgment was premature and that additional discovery was necessary. As a result, Belyakov fails in his argument that inadequate discovery made summary judgment inappropriate. See Shafer, 107 F.3d at 282. Because we conclude that Belyakov did not offer sufficient evidence to create a material issue of fact with respect to pretext, we affirm the district court's grant of summary judgment to DHHS on Belyakov's claims of retaliation in violation of Title VII.

IV.

The orders awarding summary judgment to DHHS in both cases are

AFFIRMED.

26